ACCEPTED
03-15-00025-CV
7931339
THIRD COURT OF APPEALS
AUSTIN, TEXAS
11/20/2015 3:12:21 PM
JEFFREY D. KYLE
CLERK

No. 03-15-00025-CV

## IN THE COURT OF APPEALS
## FOR THE THIRD DISTRICT OF TEXAS
## IN AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
11/20/2015 3:12:21 PM
JEFFREY D. KYLE
Clerk

_____

**LAKEWAY REGIONAL MEDICAL CENTER, LLC, and SURGICAL DEVELOPMENT PARTNERS, LLC (Appellants), and**

**LAKE TRAVIS TRANSITIONAL LTCH, LLC, N/K/A LAKE TRAVIS SPECIALTY HOSPITAL, LLC (Cross-Appellant),**

**v.**

**LAKE TRAVIS TRANSITIONAL LTCH, LLC, N/K/A LAKE TRAVIS SPECIALTY HOSPITAL, LLC (Appellee),**

**LAKEWAY REGIONAL MEDICAL CENTER, LLC, and SURGICAL DEVELOPMENT PARTNERS, LLC (Cross-Appellees), and**

**BRENNAN, MANNA, & DIAMOND, LLC, and FRANK T. SOSSI (Additional Cross-Appellees).**

_____

From the 345th Judicial District Court, Travis County, Texas
No. D-1-GN-12-000983

_____

## BRIEF OF ADDITIONAL CROSS-APPELLEES
## BRENNAN, MANNA, & DIAMOND, LLC, and FRANK T. SOSSI

_____

**Robert A. Bragalone**
BBragalone@gordonrees.com
Texas Bar No.: 02855850
**B. Ryan Fellman**
RFellman@gordonrees.com
Texas Bar No.: 24072544

**GORDON & REES LLP**
Suite 2800
2100 Ross Avenue
Dallas, Texas 75201
Phone: 214-231-4660
Fax: 214-461-4053

**November 20, 2015**

**ORAL ARGUMENT REQUESTED**

## IDENTITY OF PARTIES AND COUNSEL

**1.  Defendant/Appellant/Cross-Appellees and Their Counsel.**

Additional Cross-Appellees have no objection to the identification of Defendant/Appellant/Cross-Appellees and their counsel identified in the "Brief of Cross-Appellant Lake Travis Transitional LTCH, LLC, n/k/a Lake Travis Specialty Hospital, LLC."

**2.  Plaintiff/Appellee/Cross-Appellant and Its Counsel.**

Additional Cross-Appellees have no objection to the identification of Plaintiff, Appellee/Cross-Appellant and its Counsel identified in the "Brief of Cross-Appellant Lake Travis Transitional LTCH, LLC, n/k/a Lake Travis Specialty Hospital, LLC."

However, they note that the underlined heading "Counsel for Defendant-Cross-Appellant" at the bottom of p. ii should read "Counsel for *Plaintiff*-Cross-Appellant."

**3.  Defendant/Additional Cross-Appellees and their Counsel.**

Additional Cross-Appellees have no objection to the their and their counsel's identification in the "Brief of Cross-Appellant Lake Travis Transitional LTCH, LLC, n/k/a Lake Travis Specialty Hospital, LLC."

**4.  Caption and Identification of Parties.**

Defendants Brennan, Manna, & Diamond, LLC, and its member Frank T. Sossi, who are the attorneys who represented Defendants Lakeway Regional

Medical Center, LLC, and Surgical Development Partners, LLC, in the transaction underlying this lawsuit, were dismissed from the case before trial pursuant to a summary judgment granted by the trial court. Plaintiff/Cross-Appellant Lake Travis Transitional LTCH, LLC, n/k/a Lake Travis Specialty Hospital, has appealed that summary judgment as part of its cross-appeal against the Defendants involved in the trial verdict.

The result has been that Brennan, Manna, and Diamond, LLC, and Frank T. Sossi are sometimes referred to as "Appellees," and sometimes as "Cross-Appellees." Each may be misleading. To make it clear that these parties were not parties to the original appeal in this matter, and that their only role is as appellees in Plaintiff's cross-appeal, we have denominated them "Additional Cross-Appellees" in the caption.

Reading the submissions in this matter can be difficult because the parties have similar-sounding names, all of the non-attorney parties are both appellant(s) and appellee(s), and the many initialisms hinder clarity. This Brief will refer to the parties as follows:

| | |
|---|---|
| Plaintiff/Appellee/Cross-Appellant<br>Lake Travis Transitional LTCH, LLC,<br>nka Lake Travis Specialty Hospital | Lake Travis |
| Defendant/Appellant/Cross-Appellee<br>Lakeway Regional Medical Center, LLC | Lakeway |

| | |
|---|---|
| Defendant/Appellant/Cross-Appellee Surgical Development Partners, LLC | Surgical Development (together with Lakeway, "Hospital Appellants") |
| Defendant/Additional Cross-Appellee Brennan, Manna, & Diamond, LLC | the Brennan Firm |
| Defendant/Additional Cross-Appellee Frank T. Sossi | Sossi (together with the Brennan Firm, "Lawyer Appellees") |

"Defendants" will be used from time to time to refer to all defendants below (Lakeway, Surgical Development, the Brennan Firm, and Sossi).

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ................................................................... i

TABLE OF CONTENTS.................................................................................... iv

INDEX OF AUTHORITIES.............................................................................. vii

NOTE ON RECORD REFERENCES.....................................................................x

STATEMENT OF THE CASE......................................................................... xii

STATEMENT REGARDING ORAL ARGUMENT..............................................xv

STANDARD OF REVIEW ............................................................................ xvi

ISSUE PRESENTED.................................................................................... xviii

STATEMENT OF FACTS ...................................................................................1

    I.     THE FACTS OF RECORD DO NOT REVEAL THE EXISTENCE, MUCH LESS THE MISUSE BY THE LAWYER APPELLEES, OF ANY "TRADE SECRETS."..................................................................1

          A.     There Is No Such Thing As a "Project File." ..........................1

          B.     Lake Travis's Berry Refused to Identify Trade Secrets Claimed to Have Been Misappropriated by the Lawyer Defendants...........................5

          C.     Lake Travis's Trade Secret Expert R. Mark Halligan Similarly Refused to Identify Misappropriated Trade Secret Information, and the Trial Court Rejected His and Lake Travis's Theory of the Case. ........10

    II.     THE COURSE OF EVENTS DOES NOT PORTRAY MISAPPROPRIATION BY THE LAWYER APPELLEES OF LAKE TRAVIS'S "TRADE SECRETS."................................................13

          A.     The Brennan Firm and Sossi Represented Surgical Development and Lakeway in the Development of Lakeway Regional Medical Center. ........................................13

          B.     Lake Travis Attempts to Build and Operate Lake Travis Specialty Hospital, but Hits a Potentially Fatal Snag. ...........14

          C.     The Brennan Firm and Sossi Are Also Counsel for Health Care REIT, a Partner of Lake Travis's Landlord HCN Interra, from whom Sossi Learns Details of Plaintiff's Plan to Operate Lake Travis Specialty Hospital.....................................15

---

D. Surgical Development Signs a Letter of Intent on Behalf of Lakeway with Lake Travis's Principals to Investigate a Potential Transaction. ...................................................................17

E. After Conducting Due Diligence, Lakeway Decides Not To Acquire Lake Travis's Lease. .............................................................18

F. Lakeway Obtains a Mortgage Guarantee for Its Lakeway Hospital Project from HUD, and Sossi Responds to Questions from HUD. ...............................................................................19

G. The May 10 Email Does Not Disclose or Use Any "Trade Secrets" – and Lake Travis's Berry Testified that All of Sossi's Statements Were False. .......................................................................21

H. Lake Travis's Other Evidence Did Not Suggest Lawyer Appellees' Use of Its Trade Secrets. ........................................................26

I. Lakeway Hospital Opens; the Lake Travis Hospital Does Not. ................30

J. HUD Did Not Rely on Any "Trade Secrets" Communicated by the Lawyer Appellees in Issuing Lakeway's Loan Guaranty...........................31

SUMMARY OF THE ARGUMENT ........................................................................33

ARGUMENT ..............................................................................................................35

I. SUMMARY JUDGMENT STANDARD: TO DEFEAT SUMMARY JUDGMENT, LAKE TRAVIS WAS REQUIRED TO SHOW THAT THE FACTS IN QUESTION WERE MATERIAL, AND THE ISSUES GENUINE. ...................................................................................35

II. THE MATERIAL FACTS AS TO WHICH THERE ARE NO GENUINE ISSUES ALLOW ONLY THE CONCLUSION THAT LAKE TRAVIS DID NOT ESTABLISH ANY ELEMENT OF ITS CLAIM AGAINST THE ATTORNEY APPELLEES FOR TRADE SECRET MISAPPROPRIATION. ......................................................37

A. First Element: There Was No Evidence of the Identity or Existence of Any Claimed "Trade Secrets." ...............................................37

B. Second Element: There Was No Evidence Attorney Appellees Received "Trade Secrets" from Lake Travis, or Through Breach of a Relationship or Otherwise Improper Means; the Lake Travis Brief's Record Citation Is to Its Own Summary Judgment Brief in the Trial Court Which Itself Does Not Cite to the Record. .......................47

C.     Third Element: There Was No Evidence that the Lawyer Appellees "Disclosed" or "Used" any "Trade Secret." ..............................50

D.     Fourth Element: There Was No Evidence that Lake Travis's Failure Had Any Connection with Any Activity by Lawyer Appellees....................................................................................54

CONCLUSION............................................................................................63

PRAYER....................................................................................................64

CERTIFICATE OF COMPLIANCE...........................................................65

CERTIFICATE OF SERVICE ...................................................................66

# INDEX OF AUTHORITIES

**CASES**

*Alliantgroup, L.P. v. Solanji*, 2014 Tex.App. LEXIS 2961 (Tex.App. - Houston [1st Dist.] 2014, no pet.)......................................................................................................................46

*Am. Steel & Supply, Inc. v. Commercial Metals, Inc.*, 2010 Tex.App. LEXIS 1776, *5, **17-18 (Tex.App. - Corpus Christi 2010, pet. denied)........................................................58

*Bertolli v. C.E. Sheperd Co.,* 752 S.W.2d 648, 654 (Tex. App.—Houston [14th Dist.] 1998, no writ) ...........................................................................................................................41

*Bishop v. Miller*, 412 S.W.3d 758, 767 (Tex.App.—Houston [14th Dist.] 2013, no pet.)...........41

*Bohnsack v. Varco, L.P.*, 668 F.3d 262, 267 (5th Cir. Tex. 2012) ................................................59

*Brownlee v. Brownlee*, 665 S.W. 2d 111, 112 (Tex. 1984). .........................................................36

*Buck v. Palmer*, 381 S.W.3d 525, 527 n. 2 (Tex. 2012) ................................................................37

*Cudd Pressure Control, Inc. v. Roles*, 328 Fed.Appx. 961, 965 (5th Cir. 2009).........................41

*Cuidado Casero Home Health of El Paso, Inc. v. Ayuda Home Health Care Servs.*, LLC, 404 S.W.3d 737 (Tex. App. - El Paso 2013, no pet.)..............................................................58

*Daniels Health Sciences, LLC v. Vascular Health Sciences, LLC*, 710 F.3d 579, 584 (5th Cir. 2013)....................................................................................................................................54

*Game Sys. v. Forbes Hutton Leasing, Inc.*, 2011 Tex. App. LEXIS 4098, **75-76 (Tex.App.- Fort Worth 2011, no pet.) ...................................................................................45

*General Insulation Co. v. King*, 2010 Tex. App. LEXIS 490 (Tex. App. - Houston [14th Dist.] 2010, no pet.).....................................................................................................46

*Gonzales v. Zamora*, 791S.W.2d 258, 265 (Tex. App.—Corpus Christi 1990, no writ)..............41

*H.E. Butt Grocery Co. v. Moody's Quality Meats, Inc.*, 951 S.W.2d 33, 36 (Tex. App.– Corpus Christi 1997, pet. denied)..........................................................................................53

*Hyde Corp. v. Huffines*, 314 S.W.2d 763 (Tex. 1958)...................................................................54

*In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003). ............................................................................38

*KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70 (Tex. 2015); *KIT Projects, LLC v. PLT P'ship*, 2015 Tex.App. LEXIS 11475, **3-4 (Tex. App. Houston [14th Dist.] 2015)...........xv

---

*Lamont v. Vaquillas Energy Lopeno, Ltd.*, 421 S.W.3d 198, 210 (Tex.App. - San Antonio 2013, no pet.) ...................................................................37, 55

*Liggett v. Blocher*, 849 S.W.2d 846, 852 (Tex.App. – Houston [1st Dist] 1993, no writ) ............36

*Lina T. Ramey & Assocs. v. TBE Group, Inc.*, 2015 Tex.App. LEXIS 5089 (Tex.App. - Dallas 2015).............................................................................................62

*Mattox v. Timmerman*, 2013 Tex.App. LEXIS 10517, **2-3 (Tex. App. – Austin 2013, no pet.) ...........................................................................................xv

*Melendez v. Citimortgage, Inc.*, 2015 Tex.App. LEXIS 10260, *8 (Tex.App. - Austin 2015, no pet.) ......................................................................................xv

*Merriman v. XTO Energy, Inc.,* 407 S.W.3d 244, 248 (Tex. 2013); citations omitted.................xv

*Metallurgical Indus., Inc. v. Fourtek, Inc.,* 790 F.2d 1195, 1202 (5th Cir. 1986) ........................41

*Neely v. Wilson*, 2013 Tex. LEXIS 511, **10-11 (Tex. 2013)....................................................36

*Paragon General Contractors, Inc. v. Larco Constr., Inc.*, 227 S.W.3d 876, 883-884 (Tex.App. -- Dallas 2007, no pet.)............................................................45

*Parker Barber & Beauty Supply, Inc. v. Wella Corp.*, 2006 Tex.App. LEXIS 8841 (Tex. App. - Austin 2006, no pet.) ...................................................................46

*Phan Son Van v. Pena*, 990 S.W.2d 751, 753 (Tex. 1999)........................................................36

*Plas-Tex, Inc. v. Jones*, 2000 Tex. App. LEXIS 3188, *18 (Tex.App. - Austin 2000, pet denied) ......................................................................................................62

*Plotkin v. Joekel*, 304 S.W.3d 455, 487 (Tex.App. - Houston [1st Dist.] 2009, no pet.) ..............58

*Rimkus Consulting Group, Inc. v. Dupre*, 2001 Tex.App. LEXIS 6170, **10-11 (Tex.App. - Houston [14th Dist.] 2001, no pet.) ..................................................49

*Rusty's Weigh Scales & Serv., Inc. v. N. Tex. Scales, Inc.*, 314 S.W.3d 105, 111 (Tex. App. - El Paso 2010, no pet.)...........................................................................54

*Security Telecom Corp. v. Meziere*, 2000 Tex. App. LEXIS 1818 (Tex.App. – Dallas, no pet.)......................................................................................................46

*Southwestern Energy Prod. Co. v. Berry-Helfand*, 411 S.W.3d 581, 587 (Tex. App. Tyler 2013)................................................................................................41, 59

*Speedemissions, Inc. v. Capital C Enters.*, 2008 Tex.App. LEXIS 7303, **17-19 (Tex.App. - Houston [1st Dist.] 2008, no pet.)...............................................58

*Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518 (5th Cir. 1974) ........................59

**STATUTES**

Medicaid and SCHIP Extension Act of 2007 (Pub.L.No. 110-173, §114(d), 121 Stat. 2492, 2503 (2007) ............................................................................................15, 55

Rule 166a(b), Tex.R.Civ.P....................................................................................35

Rule 166a(c), Tex.R.Civ.P....................................................................................35

Rule 166a(i), Tex.R.Civ.P.....................................................................................36

## NOTE ON RECORD REFERENCES

The record on appeal consists of:

(1)    A three-volume Clerk's Record filed on May 29, 2015.  It should be noted that starting at page 201 of Volume 1 of this filing, there are 197 pages missing if the Index is used as a guide.  The result is that the Index for Volume 1 is in error after page 200.  References in this Brief will be to the numbers appearing on the documents themselves, and not to the Index designations.

(2)    A Supplemental Clerk's Record (titled "Clerk's Record") filed on May 21, 2015.  Note that this was filed before the main three-volume record that is more properly denominated "Supplemental Record" (item (1) on this list), but was filed in response to a party's request for supplementation and should be considered "supplemental" even though filed "out of order."

(3)    A Supplemental Clerk's Record (titled "Clerk's Record") filed on June 18, 2015.

(4)    A Supplemental Clerk's Record (titled "Clerk's Record") filed on July 17, 2015.

(5)    A Supplemental Clerk's Record (titled as such) filed on July 21, 2015.

This Brief will cite to these filings as follows:

| | |
|---|---|
| Clerk's Record (three volumes)<br><br>Volume 1 of 3<br>Volume 2 of 3<br>Volume 3 of 3 | <br><br>CR1 \_\_\_\_<br>CR2 \_\_\_\_<br>CR3 \_\_\_\_ |
| May 21, 2015, Supplemental Clerk's Record | 5/21 SR \_\_\_\_ |
| June 18, 2015, Supplemental Clerk's Record | 6/18 SR \_\_\_\_ |
| July 17, 2015, Supplemental Clerk's Record | 7/17 SR \_\_\_\_ |
| July 21, 2015, Supplemental Clerk's Record | 7/21 SR \_\_\_\_ |

## STATEMENT OF THE CASE

This is a suit for damages. It arose out of an investigation of a potential transaction between Lake Travis Transitional LTCH, LLC ("**Lake Travis**" or "**Appellee**"), on the one hand, and Lakeway Regional Medical Center, LLC ("**Lakeway**") and Surgical Development Partners, LLC ("**Surgical Development**"; together with Lakeway, "**the Hospital Appellants**"), on the other. Brennan, Manna, and Diamond, LLC ("**the Brennan Firm**") and its member Frank T. Sossi ("**Sossi**"; together with the Brennan Firm, "**the Lawyer Appellees**") represented the Hospital Appellants in connection with the potential transaction.

The parties never entered into the transaction.

Lake Travis filed suit against the Hospital Appellants, eventually alleging breach of confidentiality provisions in a letter of intent between Lake Travis's principals and Surgical Development and misappropriation of trade secrets. (CR1 81.)

Over six months later, Lake Travis added the Brennan Firm and Sossi as Defendants and expanded the causes of action to include "Participatory Liability Theories" of vicarious and joint and several liability. (CR1 122.)[1]

Approximately ten months later, Lake Travis amended again, adding a claim

---

[1] Lake Travis also added one of the Law Firm's affiliates, Brennan, Manna, & Diamond, P.L., as a Defendant. Lake Travis later nonsuited this entity. (Notice of Nonsuit Without Prejudice filed May 21, 2014 [not in appellate record].) It is not a party to this appeal.

for negligent misrepresentation. (CR1 158.)

Lake Travis later nonsuited the Participatory Liability Theories against the Brennan Firm and Sossi (CR3 12268), leaving only the trade secret and negligent misrepresentation claims pending against them.

The Brennan Firm and Sossi filed an Amended Traditional and No-Evidence Motion for Summary Judgment based on the lack of evidence of trade secrets under Texas law, or their communication to and use by the Lawyer Appellees. (CR2 5229.)

Following oral argument, the trial court granted summary judgment in favor of the Lawyer Appellees on the remaining trade secret misappropriation and negligent misrepresentation counts, noting that "[n]othing that could qualify as a trade secret was 'used' as that word is defined in the case law. All of the alleged secrets in [Lake Travis's] own presentation, are at least one step removed from any disclosure." (CR3 12252 [letter of reasoning]; 7/17 SR 201 [order].)

With respect to its case against the Lawyer Appellees, Lake Travis has only cross-appealed the summary judgment with respect to the trade secret misappropriation count. (Brief of Cross-Appellant Lake Travis Transitional LTCH, LLC nka Lake Travis Specialty Hospital, LLC ("LTT") ["**Lake Travis Brief**"]; *see* "Issues Presented" at p. xiv.)

Accordingly, with respect to the Lawyer Appellees, the only issue before the

Court is the correctness of the trial court's summary judgment in their favor on

Lake Travis's claims of misappropriation of trade secrets.

## STATEMENT REGARDING ORAL ARGUMENT

The Lawyer Appellees request oral argument. The facts are unusual for a trade secrets case, and this matter presents the additional complication of the impact of federal loan and loan guaranty policy and practice in the hospital services industry.

In addition, the summary judgment record contained in the Clerk's Record and Supplemental Records (of particular importance for the Lawyer Appellees, since they were not involved in the trial of this cause) is very large and fragmented. Oral argument will aid the Court in understanding the evidentiary basis for the trial court's grant of the Lawyer Appellees' summary judgment motion.

## STANDARD OF REVIEW

This Court reviews summary judgments *de novo*. (*Mattox v. Timmerman*, 2013 Tex.App. LEXIS 10517, \*\*2-3 (Tex. App. – Austin 2013, no pet.).)

On review, the court first considers the existence of cognizable evidence:

> When a party moves for summary judgment on both traditional and no-evidence grounds . . . we first address the no-evidence grounds. That is because if the non-movant fails to produce legally sufficient evidence to meet his burden as to the no-evidence motion, there is no need to analyze whether the movant satisfied its burden under the traditional motion. [*Merriman v. XTO Energy, Inc.,* 407 S.W.3d 244, 248 (Tex. 2013); citations omitted.]

"In the interest of efficiency, however, [the Court] may review under the traditional standard of Rule 166a(c) first if that standard is dispositive[.]" (*Melendez v. Citimortgage, Inc.*, 2015 Tex.App. LEXIS 10260, \*8 (Tex.App. - Austin 2015, no pet.).)

When considering the appeals from the grant of hybrid motions, especially where the trial court has not distinguished between the forms in rendering summary judgment, the reviewing court will itself frequently analyze the trial court's decision without distinguishing between the forms of motion, as both focus on the presence *vel non* of disputed facts. (*See, e.g.*, *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70 (Tex. 2015); *KIT Projects, LLC v. PLT P'ship*, 2015 Tex.App. LEXIS 11475, \*\*3-4 (Tex. App. Houston [14th Dist.] 2015) ("When, as in this case, the order granting summary judgment does not specify the grounds upon

which the trial court relied, we must affirm the summary judgment if any of the independent summary-judgment grounds is meritorious.").)

**ISSUE PRESENTED**

**ON LAKE TRAVIS'S APPEAL OF THE SUMMARY JUDGMENT IN FAVOR OF THE LAWYER APPELLEES**

**(PART OF LAKE TRAVIS'S CROSS-APPEAL)**

Did the trial court commit reversible error in granting the Lawyer Appellees' "Traditional and No-Evidence Motion for Summary Judgment" on Lake Travis's cause of action against them for misappropriation of trade secrets?

## STATEMENT OF FACTS

By the time it comes to this brief, the Court will already have seen the other parties' chronological accounts of the failure of the Lake Travis project. We will provide our own account in Section II. We begin, however, by zeroing in on the summary judgment record on the issues critical to Lake Travis's failed claim against the Lawyer Appellees.

I. **THE FACTS OF RECORD DO NOT REVEAL THE EXISTENCE, MUCH LESS THE MISUSE BY THE LAWYER APPELLEES, OF ANY "TRADE SECRETS."**

A. **There Is No Such Thing As a "Project File."**

The phrase "Project File" appears in the Lake Travis Brief 41 times, and an additional 15 times in the Declaration of Robert Berry ("**Berry Declaration**") attached to it (as Appendix 7; from CR2 7604ff). Lake Travis capitalizes it, as if it is an actual thing.

As far as the operative facts of this case go, it is not.

Neither the phrase nor the concept of "Project File" appears anywhere in the record until well into the course of litigation.

The birth of the "Project File" came about like this:

The claim against the Lawyer Appellees was limited to <u>trade secrets</u>. There was no claim that they breached the "Confidentiality" provision of the Letter of Intent ("**LOI**") between Lake Travis's principals and Surgical Development, which defined "Proprietary Information" as "<u>all information</u>

disclosed by any Party or its Representatives at any time to any other Party or its Representatives in connection with the Project in any manner[.]" (CR1 29.) So the issues with which the Brennan Firm and Sossi were contending did not relate to the universal definition of "Proprietary Information" in the LOI, but only to that information which qualified as actual trade secrets.

Throughout the discovery process, the Lawyer Appellees sought to have Lake Travis identify the embodiment, or even the substantive content, of the trade secrets Lake Travis claimed they had misappropriated. It proved to be a struggle. Subsection (B) next will describe Lake Travis's interrogatory response listing generic categories of information and Lake Travis's Chief Executive Officer and Managing Member Robert Berry's outright refusal to answer questions on Defendants' claimed use of any "secret" within any of these categories. On January 14, 2014, the Lawyer Appellees filed a motion to compel interrogatory answers identifying specific trade secrets alleged to have been wrongfully misused or disclosed, among other things. (CR2 6639 [referring to the filing].)

A week later, on January 21, 2014, Defendants deposed Plaintiff's designated expert, Chicago lawyer R. Mark Halligan. Lake Travis's designation of Halligan stated that he would testify "that the information provided by [Lake Travis] to Defendants constituted its trade secrets and that

Defendants misappropriated [Lake Travis's] trade secrets." (5/21 SR 86.) (More on Halligan in Subsection (C) below.) At his deposition, he testified that he hadn't actually looked at any documents or other information – instead, he had only reviewed Lake Travis's interrogatory answers. Included in his testimony was this puzzling passage – but his conclusion was clear:

> I also determined from my review of the relationship and all of the confidentiality surrounding the relationship that the – that the entire project, <u>which I have referred to as the project file</u> based – based upon the agreement that was entered into on May 11, 2009, where the parties define confidential information, [Lake Travis] may furnish [Surgical Development] with certain confidential nonpublic and/or proprietary information concerning a certain project – in Texas called "the project," [Surgical Development] may furnish [Lake Travis] with proprietary information concerning the business that this was defined as "the project" and at the combination or <u>compilation level</u> of – of – of – of the status of information as a trade secret, that <u>the entire project as a whole constitutes a protectable trade secret</u>. [5/21 SR 164-165; emphases supplied.]

He had not misspoken; his position really was that the entire Lake Travis project was a trade secret, consistent with Lake Travis's position on appeal that everything surrounding Lake Travis and the Lake Travis Hospital, no exceptions, is a trade secret. This was the first mention of anything called a "project file" or the identification of the entire Lake Travis project as a trade secret. Halligan admitted he had not seen the "project file" because it was "broken up into bits and pieces." (5/21 SR 166.) "I'm not quite sure how it's stored," he testified. (*Id.*) Halligan assumed that the "trial lawyers" would

compile the information into a physical compilation at some point so that they could "mark the project file as an exhibit for trial."

And that is exactly what Lake Travis's "trial lawyers" did. A month later, on February 21, 2014, Lake Travis filed its "Objections and Second Supplemental Responses" to the Lawyer Appellees' interrogatories. At the same time, it produced 2,033 pages that it called, for the first time, the "Project File," capital P, capital F. The interrogatory response not only confirmed that it was assembled by Lake Travis not in furtherance of the hospital project but only of its litigation position, it also made the same claim for the Project File that Halligan had made for the Lake Travis project itself:

> In further supplemental response to Interrogatory No. 3, [Lake Travis] is producing a set of Documents that were furnished to Defendants in connection with the "Project" (as defined by the parties in their agreements) and/or that evidence or reflect knowledge Defendants gained in the Project discussions or in the negotiation and development process for the Project. Collectively, [Lake Travis] refers to this set of documents as the "Project File." The Project File includes information furnished by [Lake Travis] and also by any third party who was included in the Project discussions as agreed by the parties. In response to this interrogatory, [Lake Travis] has gathered the Project File and organized the Project File into sub-files identified by slipsheets.
>
> \* \* \*
>
> [Lake Travis] contends that the Project File in its entirety constitutes, evidences, or reflects trade secrets of Lake Travis because it was a compilation of information used in [Lake Travis's] business that gave [Lake Travis] a competitive advantage over those who did not know it or use it. [CR2 5505-06; emphases supplied.]

Lake Travis principal Robert Berry advanced a similar description in his declaration opposing the summary judgment motion. (CR2 7604ff.) (The Berry declaration, the centerpiece of Lake Travis's appeal of the trade secret misappropriation summary judgment, will be discussed in detail in the Argument.)

The Court's attention is respectfully directed to Lake Travis's and Halligan's use of the word "compilation." This is noteworthy in light of authorities that identify "compilations" as a variety of trade secret. Without argument at this point, the Lawyer Appellees respectfully note that the Project File was not a "compilation" that existed during the period in which the operative facts of this case took place. Berry testified in an affidavit that "the trade secret comprised of the Project File is reflected in its unique combination" (CR1 2025). It follows that the "Project File" could not have been a "trade secret" because that "unique combination" did not come about until Lake Travis assembled it after the litigation was well underway.

B. **Lake Travis's Berry Refused to Identify Trade Secrets Claimed to Have Been Misappropriated by the Lawyer Defendants.**

There is no other evidence that the Brennan Firm and Sossi acquired any "trade secrets" from Lake Travis that became the subject of an improper use or disclosure. In his first sworn answer to Lawyer Appellees' interrogatory asking for identification of "all of [Lake Travis's] trade secrets that you claim [the Lawyer

Defendants] misappropriated and/or unlawfully disclosed to a third party," Berry, who was Lake Travis's CEO and Managing Member (and only living principal – Keith McDonald passed away in 2011) responded:

> The confidential and proprietary information and trade secrets misappropriated and improperly communicated and disclosed included [Lake Travis's] architectural plans; program design; financial information; hospital organization; mission; staff recruitment and retention; sources and uses of funds and other "cost based" information; preliminary financial feasibility and other information about projected revenues and costs for the initial operation of [Lake Travis]; and preliminary financial feasibility ratios and other information about projected key operational ratios of [Lake Travis]. [CR2 5499.]

However, at his deposition on August 8, 2013, when asked about these generic categories, Berry:

- Testified that he had never met Frank Sossi and only spoken with him on three telephone conference calls that related to negotiations on the LOI and the release of escrow funds – not trade secrets. (CR2 5371.)

- Testified that he had no knowledge of anything that Frank Sossi, or any other Defendant, discussed in meetings with HUD. (CR2 5373-75.)

- Testified that he had no knowledge of whether Sossi misappropriated any of those claimed Lake Travis trade secrets, other than what his attorneys told him, refusing to answer direct questions as to misappropriation of information from the very categories of

documents he listed in his previously sworn interrogatory answer, upon instruction from counsel:

Q.    So, other than information learned from your attorneys, you have no outside knowledge [of trade secret misappropriation]?

A.    None that I recall.  [CR25375.]

* * * *

Q.    * * *  And when is the first time that you believe that Frank Sossi disclosed any [Lake Travis] trade secret to anybody.

A.    I would not – I'm not able to – I'm not going to share that information with you as that is privileged.  [CR2 5377.]

* * * *

Q.    Do you have any personal knowledge as to whether Frank Sossi ever disclosed [Lake Travis's] <u>architectural plans</u> to HUD?

    [Form objection omitted.]

A.    I'm not able to answer that question.

Q.    Why not?

    MR. KUCZAJ:  You can answer to the extent that you won't disclose your conversations with counsel.

A.    I'm unable to answer the question.

Q.    Do you have any personal knowledge as to whether Frank Sossi ever disclosed [Lake Travis's] <u>program design</u> to HUD?

    MR. KUCZAJ:  Same instruction.

A.    Same answer.

Q.     *   *   *   Do you have any personal knowledge as to whether Frank Sossi ever disclosed [Lake Travis's] <u>financial information</u> to HUD?

MR. KUCZAJ:  Same instruction.

A.     Same answer.

Q.     Do you have any personal knowledge as to whether Frank Sossi ever shared [Lake Travis's] <u>hospital organization</u> with HUD?

MR. KUCZAJ:  Same instruction.

A.     Same answer.

Q.     Do you have any personal knowledge as to whether Frank Sossi ever shared [Lake Travis's] <u>mission</u> with HUD?

MR. KUCZAJ:  Same instruction.

A.     Same answer.

Q.     Do you have any personal knowledge as to whether Frank Sossi ever shared [Lake Travis's] <u>staff recruitment and retention</u> with HUD?

MR. KUCZAJ:  Same instruction.

A.     Same answer.

Q.     Do you have any personal knowledge as to whether Frank Sossi ever shared the <u>sources and uses of funds and other cost-based information</u> of [Lake Travis] to HUD?

MR. KUCZAJ:  Same instruction.

A.     Same answer.

Q.     Do you have any personal knowledge as to whether Frank Sossi ever shared preliminary financial feasibility and other

information about <u>projected revenues and costs</u> for the initial operation of [Lake Travis] with HUD?

> MR. KUCZAJ:  Same instruction.

A.    Same answer.

Q.    And finally, do you have any personal knowledge of whether Frank Sossi ever shared [Lake Travis's] <u>preliminary financial feasibility ratios and other information about projected key operational ratios</u> of [Lake Travis] with HUD?

> MR. KUCZAJ:  Same instruction.

A.    Same answer.  [CR2 5377-5380; emphases supplied.]

Counsel for the Lawyer Appellees tried to get at the material facts for Lake Travis's trade secret claim in a different way, with the same results:

Q.    What specific trade secret of [Lake Travis] do you believe was shared with HUD which HUD relied on to issue a guarantee to [Lakeway]?

> [Form objection omitted.]

A.    I'm not going to answer that question because I would have obtained that information from my attorney.

> [Colloquy omitted; Lakeway counsel repeats the question:]

Q.    What specific trade secret of [Lake Travis] do you believe was disclosed to HUD that HUD relied on to determine whether or not to issue a guarantee to [Lakeway]?

> [Form objection and instruction not to answer omitted.]

A.    I will not answer that question.  (CR2 5381-82.)

**C.** **Lake Travis's Trade Secret Expert R. Mark Halligan Similarly Refused to Identify Misappropriated Trade Secret Information, and the Trial Court Rejected His and Lake Travis's Theory of the Case.**

Plaintiff's sole "trade secret" expert (in fact – after Berry's refusal to answer – the sole witness Lake Travis offered to testify on the identity of trade secrets and their misappropriation by the Lawyer Appellees) R. Mark Halligan is not mentioned in the Lake Travis Brief.

Recall that Lake Travis's designation of Halligan stated that he would testify "that the information provided by [Lake Travis] to Defendants constituted its trade secrets and that Defendants misappropriated [Lake Travis's] trade secrets." (5/21 SR 86.) The "project file" Halligan mentioned for the first time in his January 21, 2014, deposition was then assembled by Lake Travis and produced to Defendants on February 21 as the "Project File." Defendants were allowed to redepose Halligan on April 11.

He testified in his depositions:

(1) Despite the fact that the hastily-assembled "Project File" was only days old at that point, he testified that it was a "unique combination and protectable as a trade secret." (5/21 SR 177-78.) (Robert Berry testified to the same effect in the Berry Declaration; *see* Argument, Subsection II(A), CR2 7609.)

(2) Halligan contended that all information Defendants were

provided was a trade secret, which he called "confidential project information," based on his reading of the LOI (5/21 SR 184) – to which the Lawyer Appellees were not parties and which Lake Travis was not charging them as having breached. In fact, Halligan went even further, testifying that "that entire project as a whole constitutes a trade secret." (5/21 SR 164-165.)

(3) He had never read Sossi's deposition or affidavits (read no depositions at all other than Berry's before his second deposition); he could not identify any information other than Sossi's own May 10 Email (discussed in Section (B)(6) below, sent over two months after HUD guaranteed Lakeway's loan), that the Lawyer Appellees had supplied to HUD; and he had not analyzed any document included in the "Project File." (5/21 SR 154-56, 167, 187-88, 189-90, 191, 193-96.)

(4) He did not review the "Project File" prior to his first deposition. (5/21 SR 116.) He testified that he did not need to review the information to determine if it was a trade secret. (5/21 SR 145-46.)

(5) Halligan's sole criterion for whether any information was a trade secret – which he repeatedly reaffirmed – was whether it fell into one of Lake Travis's categories of generic information in its interrogatory answers quoted in Subsection (B) above. If Lake Travis said it was a

trade secret in its interrogatory answer, then, according to Halligan, any document falling within the generic category was a trade secret. (5/21 SR 147-49.) For example, when asked if the adequacy of Lake Travis Hospital parking was a trade secret, he responded: "I would go to the answers to interrogatories . . . to see whether or not the adequacy of the parking . . . has been defined by the plaintiff as a specific alleged trade secret at issue in this litigation." (5/21 SR 150.) More generally, he testified that in determining whether anything in the case was a trade secret "the analysis I have done is to look at how the plaintiff has defined the alleged trade secrets at issue." (5/21 SR 33-34 [excerpted in brief; record cite in brief is in error].)

(6) Halligan agreed to testify that what Lake Travis's counsel told him they thought were trade secrets were, in fact, trade secrets, and were, in fact, misappropriated, during his first phone conference with Lake Travis counsel, before he had reviewed (or declined to review) any of the evidence in this case, and before he was even retained. (5/21 SR 170-72.)

The trial court rejected Halligan's testimony on the designated topics and his theory of the case. On July 16, 2014, the trial court issued an order forbidding Halligan from testifying that "(a) the information provided by [Lake

Travis] to Defendants constituted trade secrets, or (2) that Defendants misappropriated [Lake Travis's] trade secrets."   (CR3 12262.)

*    *    *

To summarize:  (1) the "Project File" was a creation of Lake Travis that was not "compiled" or produced to Defendants until well into the course of litigation; (2) Lake Travis repeatedly refused to identify its supposedly misappropriated trade secrets except in the most generic way; and (3) its "expert" on the subject knew almost nothing about the record in the case and could identify no specific information that was either a "trade secret" or misappropriated.

The empty trial court record on "trade secrets" is fully consistent with the events of the case in which the Lawyer Appellees participated.

## II.   THE COURSE OF EVENTS DOES NOT PORTRAY MISAPPROPRIATION BY THE LAWYER APPELLEES OF LAKE TRAVIS'S "TRADE SECRETS."

The record on the underlying facts of this case contains no mention of the "Project File" or any "project file."

### A.   The Brennan Firm and Sossi Represented Surgical Development and Lakeway in the Development of Lakeway Regional Medical Center.

Defendant Surgical Development Partners, LLC ("**Surgical Development**") develops hospitals and outpatient surgery centers.  (CR2

5288.)  In March, 2008, Surgical Development, as agent for Lakeway Regional Medical Center, LLC ("**Lakeway**"), began developing a general acute care hospital in Lakeway, Texas that would be known as "Lakeway Regional Medical Center" ("**Lakeway Hospital**"). (CR2 5289.)  The law firm Brennan, Manna, & Diamond, LLC ("**the Brennan Firm**") represented Surgical Development and Lakeway. (CR2 5306-5307, 5291.)  Brennan Firm attorney Frank Sossi ("**Sossi**") was Surgical Development's and Lakeway's lead counsel for the development of Lakeway Regional Medical Center.  (CR2 5326, 5287.)

B.     <u>**Lake Travis Attempts to Build and Operate Lake Travis Specialty Hospital, but Hits a Potentially Fatal Snag.**</u>

Lake Travis Transitional LTCH, LLC ("**Lake Travis**"), was formed to develop and operate a health care facility in Lakeway, Texas, to be called Lake Travis Specialty Hospital ("**Lake Travis Hospital**").  Lake Travis Hospital was originally designed and built as a long-term acute care hospital ("**LTACH**").  (CR2 5340-41.)  In order to finance the project, LTT entered into a ground lease with HCN Interra Lake Travis LTACH, LLC ("**HCN Interra**").  (CR2 5349, 5351.)  Under the terms of the lease, HCN Interra would own the building of Lake Travis Hospital.  (CR2 5348, 5349, 5352-53.)

Construction of Lake Travis Hospital began in August 2008.  (CR2 5349.)  However, storm clouds had already begun to gather over the project.  In 2007, Congress enacted the Medicaid and SCHIP Extension Act of 2007 (Pub.L.No. 110-

173, §114(d), 121 Stat. 2492, 2503 (2007) (together with applicable regulations, "**Act**"), placing a moratorium on the licensure of new long-term health care facilities, such as LTACHs.  Lake Travis determined that its ability to get a license as an LTACH was in doubt under the "grandfathering" provisions of the Act and that, among other reasons, was why it decided to abandon its original strategy and instead to pursue licensure as a general (as opposed to a long-term) acute care hospital.  (CR2 5360-64.)

## C.    The Brennan Firm and Sossi Are Also Counsel for Health Care REIT, a Partner of Lake Travis's Landlord HCN Interra, from whom Sossi Learns Details of Plaintiff's Plan to Operate Lake Travis Specialty Hospital.

But that strategy prompted by the Act created another problem for Lake Travis, because its two principals – Robert Berry and Keith McDonald ("**Berry**" and "**McDonald**") – did not have recent experience working at a general acute care facility, and had never developed one.[2]  Thus, in late 2007 or early 2008, a real estate investment trust named Health Care REIT, one of the joint venturers who founded Lake Travis's landlord HCN Interra, retained the Brennan Firm to provide legal advice on the impact the Act's LTACH moratorium would have on the development of Lake Travis Specialty Hospital.

---

[2]  *See* Lakeway Regional Medical Center, LLC's and Surgical Development Partners, LLC's Opening Appellant's Brief ("**Lakeway Appellants' Brief**") at 2, second full paragraph, adopted by reference with record citations pursuant to Rule 9.7, Tex.R.Civ.P. ("Any party may join in or adopt by reference all or any part of a brief, petition, response, motion, or other document filed in an appellate court by another party in the same case.").

(CR2 5311, 5313-5316.) Sossi was the Brennan Firm's attorney who provided the legal advice. (CR2 5312.)

To assist Sossi in that engagement, Health Care REIT – not Lake Travis – provided Sossi with Lake Travis's timeline for the completion of Lake Travis Specialty Hospital and Plaintiff's spreadsheet of incurred expenses. (CR2 5319-20.) Sossi also independently gathered information about Plaintiff from public records, such as governmental filings and Health Care REIT's public website. (CR2 5316-18.) At his deposition, Sossi noted that site plans for Lake Travis Hospital were the subject of "government filings." (CR2 5317.) Sossi was experienced in this area, having been working with Health Care REIT on a number of other similar projects not involving Lake Travis that were in the development phase. (CR2 5316.)

In March 2009, Health Care REIT contacted Frank Sossi regarding whether Surgical Development/Lakeway would have any interest in acquiring Lake Travis's leasehold rights pursuant to the HCN Interra lease. The email from Health Care REIT is an example of the kind of detailed information Health Care REIT – one of the joint venturers who founded Lake Travis's landlord HCN Interra – was conveying to the Lawyer Appellees before the latter had any contact with the "third party" – Lake Travis – mentioned in this email:

> Construction should be completed in 1Q10, approx February. Yes it was built to be an LTACH, but it was built to Texas acute care

standards, not specialty hospital standards, so it could be operated as a short stay hospital without additional licensure-related costs. There are 2 ORs, imaging space, lab space, 6 ICU beds, etc. Can be expanded horizontally by 12-20k sq ft – trying to confirm the exact number. Probably [*sic*; room?] for additional OR's if you wanted to operate the building as a hospital. We own the parcel next door – planned for approx 50k sq ft of medical office. So although the hospital itself is only 55k sq ft today, most outpatient and administrative services could be put in the MOB.

We have a signed lease with a third party, so we don't exactly control this one, but recent Medicare related LTACH issues have caused us to consider alternatives. [CR2 5400.]

Lakeway did have an interest in acquiring the lease, thinking that it might use the site as an initial campus for Lakeway Hospital. (CR2 5321.) Lakeway had its own concerns over the possibility that the new Patient Protection and Affordable Care Act would include a ban on physician-owned hospitals like its own planned Lakeway Hospital. (Lakeway Appellants' Brief at 3, first full paragraph with record citations; Rule 9.7, Tex.R.App.P.) As a result of Health Care REIT's initiative, in late April 2009 Surgical Development (on behalf of Lakeway) contacted Lake Travis to initiate discussions on taking over the Lake Travis lease and improvements. (CR1 154.)

### D. Surgical Development Signs a Letter of Intent on Behalf of Lakeway with Lake Travis's Principals to Investigate a Potential Transaction.

On September 15, 2009, Surgical Development, as a disclosed agent for Lakeway, executed a letter of intent ("**LOI**") with Lake Travis's principals

Berry and McDonald for the "acquisition of the lease." (CR2 5403, 5372.)

Sossi represented Surgical Development and Lakeway in the drafting of the LOI. (CR2 5323.) The potential transaction described in the LOI was subject to multiple material conditions, including approval by Lakeway's Board of Managers; landlord HCN Interra's approval of the lease assignment; Lakeway's ability to obtain funding; and a "reasonable due diligence process related to the feasibility of the Facility to serve as a campus for a general acute care hospital as configured or reasonably modified." (CR2 5403-09.)

The confidentiality provision of the LOI defines <u>all</u> information to be exchanged by the parties as "Proprietary Information." (CR2 5405-06.) The LOI does not suggest expressly or by implication that all or any of that information is a "trade secret" as defined by Texas law.

Neither the Brennan Firm nor Sossi were parties to the LOI. They were not charged with its breach in the trial court.

### E. After Conducting Due Diligence, Lakeway Decides Not To Acquire Lake Travis's Lease.

From September 15, 2009, through March, 2010, Lakeway performed a due diligence investigation pursuant to the LOI. In March 2010, Lakeway decided not to consummate the potential transaction, because of the excessive expense required to convert the facility from its original LTACH design to a full-service general acute care hospital. In addition, Lakeway and Lake

Travis's landlord's principal Health Care REIT could not agree upon the terms of the modified lease that would have to have been executed if the proposed transaction had been completed. There was also uncertainty over whether Lakeway's major investor would advance additional funds to finance the development at the Lake Travis site. (CR2 5291-94, 5295-96, 5324, 5325.) These issues, plus the regulatory uncertainty regarding Housing and Urban Development ("**HUD**") approval, ultimately caused Lakeway's Board of Managers to reject the proposed transaction. On March 22, 2010, HCN notified Plaintiff that LRMC had elected not to complete the transaction. (CR2 5295-96, 5487-88.)

At this point – March 2010 – no person associated with Lakeway or Surgical Development had provided any information, trade secret or otherwise, to HUD about Lake Travis or Lake Travis Hospital. (CR2 5539.)

## F.  Lakeway Obtains a Mortgage Guarantee for Its Lakeway Hospital Project from HUD, and Sossi Responds to Questions from HUD.

Nothing in the LOI, expressly or by implication, obligated Lakeway to cease its own efforts to develop Lakeway Hospital. (CR2 5403-09.)

In March 2010, HUD committed to guarantee Lakeway's construction loan for Lakeway Hospital (CR2 5417) through a program designed to encourage the development of hospitals in underserved areas. (Lakeway Appellants' Brief at 7, first two full paragraphs with record citations; Rule 9.7, Tex.R.App.P.)   After

receiving a complaint from the CEO of another area hospital that the area was not underserved because Lake Travis Hospital was also underway (Lake Travis was obviously not a secret to the medical services community), HUD e-mailed Lakeway's primary lender with eight general questions about Lake Travis Hospital. (CR2 5419.)

On May 10, 2010, Sossi attempted to answer those questions in an email to the responsible HUD official, Robert Deen ("**Deen**"). (CR2 5422; "**the May 10 Email**".) When responding to HUD's questions, Sossi did not rely upon any of LTT's confidential, proprietary, or purported "trade secret" information, in this or in subsequent communications with HUD. Instead, as illustrated above in Subsection (C), Sossi learned a great deal of information about Lake Travis and the proposed Lake Travis Hospital not from Lake Travis, but from a principal of Lake Travis's landlord (Health Care REIT, who the Brennan firm also represented) and publicly available documents, as he testified in his affidavit:

> As part of the process of developing Lakeway Regional, I learned information about Lake Travis Specialty Hospital ("Lake Travis Hospital") from conversations with Health Care REIT and from publicly available documents. As early as March 2008, I was communicating with Health Care REIT, and Health Care REIT provid[ed] information to me about [Lake Travis] and Lake Travis Hospital, including financial information. I also learned information regarding Lake Travis Hospital through my representation of Health Care REIT, which occurred prior to [Lakeway's] consideration of the acquisition of the Lake Travis Hospital lease.

> On May 10, 2010, I responded to an e-mail from HUD and provided

my view of certain questions HUD had regarding [Lake Travis] and the proposed Lake Travis Hospital. I subsequently sent additional correspondence to HUD. In corresponding with HUD on May 10, 2010, and afterward, I did not rely upon any of [Lake Travis's] Proprietary Information [i.e., as defined in the LOI], trade secrets, or other confidential information. Any information conveyed to about [Lake Travis] or Lake Travis Hospital on May 10, 2010, and afterward resulted from information obtained from Health Care REIT and from publicly available sources. [CR2 5494.]

**G.** **The May 10 Email Does Not Disclose or Use Any "Trade Secrets" – and Lake Travis's Berry Testified that All of Sossi's Statements Were False.**

The Court's attention is invited to the May 10 Email, which is the centerpiece of Lake Travis's claims against the Lawyer Appellees:

Sossi begins by providing information on the history, number of beds, and medical specialty not of Lake Travis, but of Westlake Hospital, the one that complained about the HUD loan guarantee (suggesting that information of this sort about hospitals is not exactly secret). He next reviews Lakeway's actions investigating the impact of Lake Travis's legislative problems (themselves not a trade secret) on Lakeway, and Lakeway's consideration of its own potential use of the facility. He states that he is "not aware" of any request for a zoning change or plans for parking or traffic impact studies "required for the conversion process." (CR2 5422.) No Lake Travis trade secrets here.

Sossi then responds to the eight questions HUD was asking.

In answer to the first question, Sossi discusses the size, number of beds, the

---

kind of information he was receiving in the very first communication from Health Care REIT, consistent with his affidavit testimony that he did get this type of information from Health Care REIT. This information was also publicly available from a Lake Travis engineers report filed with the City of Lakeway and disclosed by its mayor, described below in Subsection (H). Sossi mentions the location of the facility, the size of the parking lot, the publicly-available information on zoning and lack of zoning changes. He states his view that parking is inadequate and that conversion would "cost a great deal of money" and that there were "code issues." (CR2 5423.) As will be seen in this Subsection below, the evidence is that none of these opinions or topics was a trade secret.

In questions 2, 3, and 4, Sossi passes along the name of the Lake Travis development, its joint-venture history, and ownership. Question 5 repeats the information on the size of the hospital and expresses the opinion that "limited imaging" would cause issues for an acute care facility. Question 6 notes the existence of the finance lease, information Sossi received from Health Care REIT before he even knew Lake Travis's name. Question 7 asked if Lake Travis was really going to open in summer 2010, and Sossi replies that "we do not believe so." In HUD's final question 8, it asks about Lake Travis's medical staff, and Sossi replies "none that we are aware of." (*Id.*)

As Sossi testified, this information is all either publicly available (or

available to anyone viewing the project and in any event not secret) or provided to him by a party with a keen interest in the success of Lake Travis, its landlord's principal Health Care REIT. And the rest of it is Sossi's opinion.

But the most dramatic demonstration contained in the summary judgment record that none of these items is a "trade secret" is Lake Travis's CEO Robert Berry's testimony that it is Lake Travis's position that Sossi's information and opinions about Lake Travis Hospital in the May 10 Email were false or inaccurate or never provided to Lakeway or Surgical Development (recall Berry's testimony cited in Subsection (I)(B) above that he never met or spoke to Sossi other than about the LOI):

- That Lake Travis missed the deadline to qualify as an LTAC. (CR2 5359 ["I don't believe that's an accurate portrayal."].)[3]

- That the Lake Travis facility, in the fall of 2009 and the spring of 2010, had numerous code violations (CR2 5364 ["Q: Was it true that the Lake Travis facility had numerous code violations in the fall of '09 and the spring of '10? A: No."].) ;

- That conversion of Lake Travis Hospital to true general acute care hospital would cost a great deal of money. (CR2 5365 ["Q: Did anyone at Lake Travis ever provide information to [Lakeway or

---

[3] Form objections omitted in these bullet-point excerpts from the Berry deposition.

Surgical Development] that the conversion of Lake Travis from an LTCH to a general acute care hospital was going to cost a great deal of money?  A:  No."].)

- That it would be difficult to expand Lake Travis Hospital in the future.  (CR2 5366 ["Q:  Did anyone at Lake Travis ever provide any information to [Lakeway or Surgical Development] that the Lake Travis facility would be difficult to expand in the future?  A:  No.  Q: Was it true that the Lake Travis facility would be difficult to expand in the future?  A:  No."].)

- That Lake Travis has no physician support.  (CR2 5366-67 ["Q:  Was it true that Lake Travis lacked physician support for its general acute care hospital plan [in the fall of '09, spring of '10]?  A:  No."].)

- That the lease was structured as a 100% interest-only lease.  (CR2 5367 ["Q:  Since you're not familiar with the term, would it be accurate to say that it's highly unlikely that you made that statement to [Surgical Development or Lakeway]?  A:  Yes."].)

- That Lake Travis Hospital would not open in summer of 2010.  (CR2 5368 ["Q: To your knowledge, did anyone at Lake Travis tell or provide information to [Lakeway or Surgical Development] that Lake Travis would not open by the summer of 2010?  A:  No."].)

- That Lake Travis Hospital did not have an operator. (CR2 5368-69 ("Q: Are you aware of anybody at Lake Travis – telling or providing information to [Lakeway or Surgical Development] that Lake Travis, the facility, didn't have an operator? A: No. During the period of time of the fall '09 and the spring of '10, was it true that Lake Travis didn't have an operator? A: No."].)

- That Lake Travis Hospital did not have an operational staff. (CR2 5369 ["Q: To your knowledge, did anyone at Lake Travis ever tell or provide information to [Lakeway or Surgical Development] that Lake Travis did not have an operations or medical staff? A: No. Q: Was it true during the period fall '09 and the spring of '10 that Lake Travis didn't have an operational or medical staff? A: No, to either question."].)

- That Lake Travis Hospital did not have a list of interested physicians. (CR2 5369-70 ["Q: Are you aware of anybody at Lake Travis providing information to [Lakeway or Surgical Development] that Lake Travis did not have a list of interested physicians? A: No. Q: Was it true that Lake Travis did not have a list of interested physicians in the period of the fall '09 to the spring of '10? A: No."].)

- That the City of Lakeway would need to approve any physical

conversion changes from and LTCH to a general acute care hospital. (CR2 5370 [Q: Are you aware of anyone at Lake Travis who provided information to [Lakeway or Surgical Development] that the City of Lakeway would need to approve any modifications or construction changes that were made to Lake Travis, converting from an LTCH to a general acute care hospital? A: No. Q: Was it true that the City of Lakeway would need to approve any physical conversion changes from an LTCH to a general acute care hospital for Lake Travis? A: No."].)

The summary judgment evidence, therefore, was that – according to the admissions in Lake Travis's CEO's sworn testimony – Sossi's statements conveyed in the May 10 Email were not only not true, they were not communicated by Lake Travis to Lakeway, Surgical Development, or Sossi.

## H. Lake Travis's Other Evidence Did Not Suggest Lawyer Appellees' Use of Its Trade Secrets.

With one exception, the May 10 Email is the only evidence of communication of supposed "trade secrets" argued by Lake Travis to have been communicated to HUD by the Lawyer Appellees. The exception is a fax from Sossi to two HUD litigation attorneys dated June 21, 2010. ((Lake Travis Brief at 6-7, 26; CR2 8108-10.) But this document supports summary judgment for the Brennan Firm and Sossi.

The letter starts out with Sossi writing:

We have contacted the City of Lakeway and they have provided the attached letter. As indicated in the letter the City has been told the [Lake Travis Hospital] was to be a long term acute care hospital and has not been qualified in the City for general care services. Any modifications as needed to provide those services instead of "long-term acute care services" have not been vetted by the City and to date there are no definitive plans for the conversion that have been approved by the City. [CR2 8109.]

So the information about Lake Travis's conversion issues with the City of Lakeway did not come from any "trade secret" of Lake Travis, but from information in the possession of the City of Lakeway. But even more significant is the "attached letter" from the Mayor of Lakeway, Dave DeOme, to Lakeway's Chairman Sam DeMaio, M.D. It is worth quoting nearly in full, as it eliminates the possibility of any genuine issue of material fact regarding the claimed "trade secrets" and their "disclosure" and "use":

Thank you for sending me a copy of <u>a letter from Abe Kuczaj attorney for the Lake Travis Transitional Medical Center to Roger Miller, U.S. Department of Housing and Urban Development</u>, regarding the Section 242 HUD guarantee of the loan to the Lakeway Regional Medical Center dated June 11, 2010.

This letter asserts that the Lake Travis Transitional Medical Center "is slated to open in the fall of 2010" and that "Lake Travis is an acute care hospital". Finally, the letter asserts that the Lakeway C-1 zoning expressly includes an Acute Care Hospital. * * *

The letter seems to imply that the Lakeway City Council approved a General Development Plan for an "acute care hospital". * * * I remember the discussion as being one that discussed a long-term care facility. <u>A document in our files from Abbe Engineering Co., the</u>

developer's engineer, describes that Lakeway Transitional Medical Center as "a 46-bed long-term acute care hospital."

Let's first be specific as to what exists in Lakeway today. Today there is an unfinished building that has been under construction for over two years. <u>I do not believe that the incomplete facility behind the Post Office currently qualifies as a provider of acute care service to this community and at the current space construction, I don't see how it can be "open in the fall".</u> This is especially true if extensive modifications have to be made. If modifications are planned it would need to be discussed with the City.

This construction site is active but the pace of work is slow relative to other ongoing construction projects. Please be aware that <u>the records of the City of Lakeway have shown and continue to show this unfinished building is intended to be a long term acute care hospital.</u> There has not been any official or unofficial communication to the City of Lakeway by any representative of the Lakeway Transitional Medical Center at the business plan for this building has substantially changed.

In fact, just the opposite is true. Roughly a month ago, City staff contacted the developer to ask about the slow pace of construction and to determine the developer's current expectations. <u>The developer specifically told our staff that there were no changes in the original plans</u>. [CR2 8111; emphases supplied.]

Summarizing this evidence, which was sponsored by Lake Travis in its summary judgment opposition below and its Brief here:

     (1)    Lake Travis's counsel himself was communicating with HUD on topics it is now charging Lakeway's counsel with having "used" and "disclosed" as a trade secret.

     (2)    The City of Lakeway was under the impression that Lakeway was still slated to become an LTACH – information received from and

confirmed by Lake Travis, not the Lawyer Appellees.

(3)     Lake Travis's engineering firm provided information to the City of Lakeway, available in the public file, regarding the facility's use and number of beds.  This information was therefore not a trade secret disclosed by the Lawyer Appellees, and not even disclosed to Lakeway by Lake Travis.

(4)     Lakeway itself, on the evidence of its Mayor's own eyes (and not any "trade secret"), had concluded that the facility was not going to open in the fall of 2010.

The second paragraph of Sossi's June 21 letter describes his communication with Health Care REIT concerning Lake Travis's counsel's June 11 letter, commenting on the same topics raised in Lake Travis's letter.  No trade secrets, use, or disclosure.  (CR2 8109-10.)

Viewed in the context of the entire communication, Sossi's statement in the third paragraph that "[t]he existence of the plans for [Lake Travis Hospital] were discussed in detail with the HUD Client Service Team," relied on by Lake Travis here and below, appears for what it is.  It is not itself a trade secret disclosure, and the "plans" and other items Sossi mentions in that paragraph were known in detail to the City of Lakeway and Health Care REIT (and not through any disclosure by Sossi or the Brennan Firm) and the subject of communications from Lake Travis's

counsel himself.[4]

The only other communications referred to in the Lake Travis Brief (at 26) are in-person meetings and calls in which Sossi participated. But the record citations (CR2 7777-80, 7813, 7815) are from Frank Sossi's deposition and do not reflect any communication of any Lake Travis information, "secret" or not, to HUD or anyone else.

HUD's chief representative and Lakeway contact Robert Deen testified that to his knowledge no one associated with Lakeway or Surgical Development (that is, Sossi) "disclose[d] any substantive information regarding [Lake Travis or Lake Travis Hospital] to HUD other than" the foregoing communications and others not raised by Lake Travis in its brief. (CR2 5540-41.)

## I. Lakeway Hospital Opens; the Lake Travis Hospital Does Not.

Lakeway Hospital opened in April 2012.

While Lakeway considered whether to acquire the HCN Interra/Lake Travis lease, Berry and McDonald continued to search for investors. They were not successful. Health Care REIT would not support the project unless Berry and McDonald found a partner with general acute care hospital experience. This search was also unsuccessful. Lake Travis defaulted under the lease, and it was

---

[4] Sossi also discussed the contents of this letter with HUD attorney Perrin Wright and Assistant U.S. Attorney Michael Widenback, although not with HUD's Robert Deen. (CR 5552.)

terminated. ((Lakeway Appellants' Brief at 8-9, second and third full paragraphs with record citations; Rule 9.7, Tex.R.App.P.)

## J. HUD Did Not Rely on Any "Trade Secrets" Communicated by the Lawyer Appellees in Issuing Lakeway's Loan Guaranty.

HUD's Robert Deen testified:

(1) That HUD became aware "that the owners wanted to get a State of Texas acute care license but wanted to care for long-term acute patients from a February 20th, 2009 newspaper article in the Lake Travis View." (CR2 5546.) The article quoted Berry as to the planned use of the hospital. (CR2 5547.)

(2) He had no recollection of any discussion of Lake Travis or Lake Travis Hospital in any telephone conversation he ever had with Sossi, and no other written communications than the ones already discussed above. (CR2, 5549, 5548.)

(3) HUD issued the original commitment of mortgage insurance on March 17, 2010. (CR2 5538.) Then:

Q. [P]rior to the issuance of the construction loan and mortgage guaranty in favor of [Lakeway], did any person associated with [Lakeway or Surgical Development] disclose any information to HUD regarding Lake Travis?

A. No.

Q. [P]rior to the issuance of the construction loan and mortgage guaranty in favor of [Lakeway], did any person associated with [Lakeway or Surgical Development] disclose any information to HUD regarding Lake Travis Specialty Hospital?

A.    No.  [CR2 5539.]

(The testimony in context is clear that the Lawyer Appellees are "associated with" Lakeway or Surgical Development in Deen's understanding of the question.)

It is therefore an undisputed material fact that HUD issued its guaranty before any Defendant communicated any information about Lake Travis or Lake Travis Hospital to HUD.  To aid HUD's confirmation of the propriety of that guaranty, the Lawyer Appellees used information that was either public or not acquired from Lake Travis – and, according to Lake Travis's Berry, not even a correct portrayal of the Lake Travis project.

## SUMMARY OF THE ARGUMENT

Q.  What specific trade secret of [Lake Travis] do you believe was disclosed to HUD that HUD relied on to determine whether or not to issue a guarantee to [Lakeway]?

A.  I will not answer that question.   (CR2 5381-82; form objection and instruction not to answer omitted.)

*   *   *

Q.  *   *   *   And when is the first time that you believe that Frank Sossi disclosed any [Lake Travis] trade secret to anybody?

A.  I would not – I'm not able to – I'm not going to share that information with you as that is privileged.  (CR2 5377.)

>   --   *from the deposition of Lake Travis CEO, Managing Member, and co-principal Robert Berry*

Those quotes sum up the Lawyer Appellees' argument:  (1) there was no cognizable evidence of trade secrets; (2) or of misappropriation or (3) disclosure; (4) or of any injury to Lake Travis from any of the (very few and brief) complained-of communications.  The Lawyer Appellees' motion only needed to negate one element of Lake Travis's cause of action with material facts as to which there was no genuine issue, and it negated all four of them.

Lake Travis's trade secret misappropriation claim against the Lawyer Appellees was entirely made up.  After its weaknesses were exposed in discovery, Lake Travis doubled down on its fallacious legal theory by insisting that a "Project File" created long after the petition in this case was filed, claimed to contain all

available information about Lake Travis and Lake Travis Hospital, was itself a unique "compilation" and thus, in its entirety, a trade secret. In fact, its expert witness testified that the <u>entire Lake Travis project</u>, already well underway with financing and a building under construction, was a trade secret. Its theory erroneously attempted to import its claim against the Hospital Appellants for breach of the confidentiality provisions of the LOI into its trade secrets claim against the Lawyer Appellees, but the whole effort was square-peg/round-hole. It failed and failed dramatically, as the above quotes illustrate .

Lake Travis has erroneously overreached on its "the whole project and pretend 'Project File' is a trade secret" claim for three reasons: First, it is used to excuse Lake Travis's inability to identify and qualify any particular information as a trade secret. Second, it is used to claim as a "trade secret" any communication mentioning Lake Travis, no matter how innocuous or well-known. Third, it leads to gross inflation of claimed trade secret damages, since the "trade secret" is identified as the entirety of the project. Lake Travis, however, may not define itself out of its summary judgment burden by dropping 2,033 pages on the Court's desk and swearing that there are disclosed trade secrets in there somewhere – or rather, that the whole "unique" post-complaint "compilation" is a trade secret.

Scintillae are not measured by the pound. The trial court's dismissal of the trade secrets case against the Lawyer Appellees should be affirmed.

## I. SUMMARY JUDGMENT STANDARD: TO DEFEAT SUMMARY JUDGMENT, LAKE TRAVIS WAS REQUIRED TO SHOW THAT THE FACTS IN QUESTION WERE MATERIAL, AND THE ISSUES GENUINE.

Lake Travis produced an enormous amount of verbiage in its disclosures, its interrogatory answers, and its affidavits attempting to show that it really did have trade secrets and they were really used by the Lawyer Appellees. Resistance to summary judgment, however, is not evaluated by the syllable or the pixel. The sheer repetitive stacking of unsupported assertions says nothing about whether a litigant has raised a genuine issue, or whether the facts it disputes are material.

A defendant may move with or without supporting affidavits for summary judgment. (Rule 166a(b), Tex.R.Civ.P.) With respect to traditional summary judgment, Rule 166a(c), Tex.R.Civ.P. provides:

> The judgment sought shall be rendered forthwith if (i) the deposition transcripts, interrogatory answers, and other discovery responses referenced or set forth in the motion or response, and (ii) the pleadings, admissions, affidavits, stipulations of the parties, and authenticated or certified public records, if any, on file at the time of the hearing, or filed thereafter and before judgment with permission of the court, show that, except as to the amount of damages, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the issues expressly set out in the motion or in an answer or any other response.

Once the movant produces evidence entitling it to summary judgment, the burden shifts to the nonmovant to present evidence that raises a fact issue.

(*Phan Son Van v. Pena*, 990 S.W.2d 751, 753 (Tex. 1999).)

With respect to a no-evidence summary judgment motion, Rule 166a(i), Tex.R.Civ.P. provides:

> After adequate time for discovery, a party without presenting summary judgment evidence may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. The motion must state the elements as to which there is no evidence. The court must grant the motion unless the respondent produces summary judgment evidence raising a genuine issue of material fact.

The fact issue offered by a summary judgment opponent must be genuine; she must produce tangible admissible evidence, not merely argument or conclusions, to avoid a properly supported motion for summary judgment. (*Liggett v. Blocher*, 849 S.W.2d 846, 852 (Tex.App. – Houston [1st Dist] 1993, no writ) (for a non-movant to raise a fact issue, there must be evidence to support her assertions; mere assertions are not enough); *Brownlee v. Brownlee*, 665 S.W. 2d 111, 112 (Tex. 1984).)

The Lawyer Appellees below sought summary judgment on both traditional and no-evidence grounds, characterized in the Texas cases as a "hybrid motion." Both parties offered summary judgment evidence; "therefore, the differing burdens are immaterial and the ultimate issue is whether a fact issue exists" with respect to the elements of the cause of action or defense. (*Neely v. Wilson*, 2013 Tex. LEXIS 511, **10-11 (Tex. 2013); *see also Buck v. Palmer*, 381 S.W.3d 525, 527 n. 2

(Tex. 2012) ("Both parties brought forth summary judgment evidence in the context of this hybrid no-evidence and traditional motion, so the differing burdens of the two forms of summary judgment motion are of no import here. The ultimate question is simply whether a fact issue exists").)

## II. THE MATERIAL FACTS AS TO WHICH THERE ARE NO GENUINE ISSUES ALLOW ONLY THE CONCLUSION THAT LAKE TRAVIS DID NOT ESTABLISH ANY ELEMENT OF ITS CLAIM AGAINST THE ATTORNEY APPELLEES FOR TRADE SECRET MISAPPROPRIATION.

Those elements are well-established:

> The elements of a claim for misappropriation of a trade secret are "(1) the trade secret existed; (2) the trade secret was acquired through breach of a confidential relationship or was discovered by improper means; (3) the defendant used the trade secret without authorization; and (4) [the plaintiff] suffered damages as a result." *Twister B.V. v. Newton Research Partners, LP*, 364 S.W.3d 428, 437 (Tex. App.—Dallas 2012, no pet.); *Rusty's Weigh Scales & Serv., Inc. v. N. Tex. Scales, Inc.*, 314 S.W.3d 105, 109 (Tex. App.—El Paso 2010, no pet.). [*Lamont v. Vaquillas Energy Lopeno, Ltd.*, 421 S.W.3d 198, 210 (Tex.App. - San Antonio 2013, no pet.).]

The failure of any one of these elements required summary judgment for the Lawyer Appellees. The genuinely undisputed evidence negated every one of them.

### A. First Element: There Was No Evidence of the Identity or Existence of Any Claimed "Trade Secrets."

Lake Travis went to great lengths to keep its claimed "trade secrets" secret even from the trial court.

When asked to identify the trade secrets claimed to have been

misappropriated – not just generic categories relating to every scrap of data associated with the Lake Travis venture, but actual competitively meaningful secrets meeting the common law definition – Lake Travis not only had no answer, but testified that the only items of information seemingly at issue were not conveyed to Lawyer Appellees and/or untrue, or were privileged.

There is no dispute over what Texas law defines to be a "trade secret" for purposes of the misappropriation tort: it is "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." (*In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003).)[5]   The Supreme Court has also adopted the Restatement of Torts' six-factor test, permitting examination of:

> (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of the measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.  [*Id.*]

However, the Court also cautions that these elements are "the factors are relevant, but not dispositive," noting the Restatement's own caution and calling particular

---

[5] Only the Texas common law applies to Lake Travis' trade secret claim, because the case's allegations all predated the effective date of the Texas Uniform Trade Secret Act.

attention to the requirement that the information at issue be definite:

> It is not possible to state precise criteria for determining the existence of a trade secret. The status of information claimed as a trade secret must be ascertained through a comparative evaluation of all the relevant factors, including the value, secrecy, and <u>definiteness of the information</u> as well as the nature of the defendant's misconduct. [*Id.*; emphasis supplied.]

This passage highlights the fatal problem Lake Travis had in the trial court, and has here: These tests cannot even be applied, or the remaining elements of the tort satisfied, until a tangible item or specific information claimed to be an actual trade secret is identified. In pressing its trade secret misappropriation claim, Lake Travis has attempted to elide this requirement by conflating its claim against the Hospital Appellants for breach of the confidentiality provisions of the LOI – which defines "Proprietary Information" as <u>everything</u> – "all information" – either party conveyed to the other, with its claim against all Defendants for <u>trade secret</u> misappropriation. Thus, Lake Travis claims that the entire "Project File" is a trade secret and "expert" Halligan refers to the LOI and the generic interrogatory categories to identify trade secrets.

This is an admission of defeat for the misappropriation claim. The LOI definition and interrogatory answers tell us nothing about whether any particular item communicated is a trade secret. Subsection I(A) of the Statement of Facts chronicles the Lawyer Appellees' efforts to discover exactly what trade secrets they were accused of misappropriating. Lake Travis resisted those efforts and never

produced anything tangible, admissible, or even credible.

**The 2,033-Page "Project File"** (Statement of Facts, Subsection I(A)). Lake Travis has capitalized the phrase to make it seem like something that actually existed as evidence in the operative facts of this case, and called it a "compilation" in an attempt to bring it within the Supreme Court trade secret definition. (Lake Travis Brief at 13: The Project File is "a compilation of all the documentary evidence reflecting LTT's trade secrets and proprietary information.") But it was no such thing – it was a confection whipped up by Lake Travis after its interrogatory answers on "trade secret" were challenged by Lawyer Appellees' motion to compel interrogatory answers, and after its trade secrets "expert" R. Mark Halligan was not able to identify any trade secrets that Lake Travis claimed to have been misappropriated or even received by Defendants. Lake Travis maintained that the trade secrets in question were <u>contained in</u> the Project File, but it never identified any particular trade secret claimed to have been misused. Of course, Lake Travis was also logically unable to take the position that the Project File had been conveyed to Lawyer Appellees. The Project File sure is big, but as far as evidence of "trade secrets," it's nothing.

The undisputed facts of the Project File's mid-discovery birth eliminate all of

the cases cited by Lake Travis on how a "compilation" can be a trade secret.[6] Those cases stand for the proposition that the unique arrangement of information that may not be a trade secret or may be public can be a trade secret. Agreed. But that "compilation" had to have been "compiled" by the plaintiff and displayed to, or stolen by, the defendant in the form of the allegedly protectable "unique" "compilation," not created by counsel long after the tort is alleged to have occurred and the complaint filed.

Lake Travis's other cases also look nothing like their claim here, as they dealt with actual documents actually purloined by former employees. *Gonzales v. Zamora*, 791S.W.2d 258, 265 (Tex. App.—Corpus Christi 1990, no writ) (hard-copy forms and manuals stolen by defendants); *Bertolli v. C.E. Sheperd Co.,* 752 S.W.2d 648, 654 (Tex. App.—Houston [14th Dist.] 1998, no writ) (employee who copied two briefcases full of documents and absconded to start a competing business); *Cudd Pressure Control, Inc. v. Roles*, 328 Fed.Appx. 961, 965 (5th Cir. 2009) (employee used employer's hard-copy financial statements).

Even on appeal, Lake Travis has not abandoned the fiction that the Project File is, in its entirety, a trade secret. Appendix 7 to the Lake Travis Brief is the Declaration of Robert Berry, which states in Paragraph 7 (CR2 7609): "Because

---

[6] *Bishop v. Miller*, 412 S.W.3d 758, 767 (Tex.App.—Houston [14th Dist.] 2013, no pet.); *Southwestern Energy Prod. Co. v. Berry-Helfand*, 411 S.W.3d 581, 597 (Tex. App.–Tyler 2013, pet. granted); *Metallurgical Indus., Inc. v. Fourtek, Inc.,* 790 F.2d 1195, 1202 (5th Cir. 1986).

the trade secret comprised of the body of knowledge illustrated by the Project File is reflected in its unique combination, it is not discoverable by inspection. The same is true for the vast majority of its constituent parts." With due regard for comity, that statement is false. The "combination" and anything "unique" about the Project is a litigation-purposed invention of Lake Travis and its counsel created long after the parties terminated their flirtation and Lake Travis filed suit. There is one thing true about Berry's statement – its trade secret status was not "discoverable by inspection" because there was nothing – nothing "unique," nothing that was a "combination," nothing that was a "compilation" – that existed to "inspect" <u>ever</u> in this case. Its expert didn't even inspect it.

**<u>The Berry Deposition</u>** (Statement of Facts, Subsection I(B)). When questioned at his deposition on Sossi's May 10 Email – almost the only evidence on "disclosure" or "use" (explored in greater detail in Subsection (C) next) offered by Lake Travis – <u>on each of the items listed there, he testified that each one of them was either never conveyed to the Defendants</u>, or was <u>false</u>, or both. Combine that with Berry's deposition testimony that he never spoke with Sossi about anything other than the LOI negotiation and you have no evidence of trade secrets or misappropriation.

The collapse of Lake Travis's trade secret claim at Berry's deposition continued when he refused to identify any misappropriated trade secrets on

privilege grounds (reviewed in more detail in Subsection (C) below).

**Trade Secret "Expert" Halligan** (Statement of Facts, Subsection I(C)). After the challenged interrogatory answers, artificial Project File, and amazing Berry deposition, Lake Travis offered up Mark Halligan to testify that everything identified by Lake Travis counsel, in the form of the Project File and beyond to the entire Project itself – Lake Travis's theory in the trial court and here – was a trade secret and misappropriated. Repeating our due regard for comity, it is not unkind to say that Halligan was thoroughly discredited at both parts of his deposition. The rejection of his opinions by the trial court is a rejection of Lake Travis's theory of this case.

Halligan reviewed almost nothing, he knew almost nothing, because the theory that everything was a trade secret did not require him to do so. He was there only to testify that the fact that Lake Travis had listed general categories of information in its interrogatory answer, and that the LOI identified all information as subject to its confidentiality provisions, made any item of information comprehended by those categories a trade secret, irrespective of what the information actually was. He didn't have to review any information in order to testify expertly that it was a trade secret. The trial court's order said, in effect, that Halligan's theory – which is still Lake Travis's theory – was wrong, that he was forbidden to testify that "(a) the information provided by [Lake Travis] to

Defendants constituted trade secrets, or (2) that Defendants misappropriated [Lake Travis's] trade secrets."   (CR3 12262.)

The failure of the Project File, Berry's live testimony, and expert Halligan left Lake Travis with nothing with which to resist summary judgment.  In response to the Lawyer Appellees summary judgment motion[7], Lake Travis filed the **Declaration of Robert Berry** ("**Berry Declaration**") (CR2 7604ff).  They have also attached it to their Lake Travis Brief as Appendix 7, although they have omitted its exhibits.  With respect to Texas law's requirements for trade secrets, here's what Berry has to say about the Project File:

> I have reviewed each of the documents in the Project File.  The Project File contains information that [Lake Travis] used in its business that provided [Lake Travis] with an advantage over competitors who did not know or use it.  Much of the information in the Project File is or reflects confidential and proprietary information that provided [Lake Travis] with a competitive advantage, and [Lake Travis] considered this information a trade secret.  [CR2 7607.]
>
> [Lake Travis] owned the trade secrets contained in the Project File and used them in its business.  These trade secrets in the Project File were not generally known or readily available to the public.  [CR2 7608.]
>
> The trade secrets contained in the Project File are valuable to [Lake Travis].  [Lake Travis] spent a great deal of time, energy, and money developing the information.  [Description follows of time and money spent developing *Lake Travis*, but not any specific identified trade secret information.]  [CR2 7609-10.]

---

[7]   Lawyer Appellees note that "Plaintiffs' Amended Response to Brennan, Manna & Diamond, LLC  .  .  .   and Frank T. Sossi's Amended Traditional and No-Evidence Motion for Summary Judgment" does not appear to have been included the appellate record, although the joint appendix it filed in support of all Defendants' motions is present.  (CR2 7598ff.)

Berry's affidavit endlessly repeats that trade secret information was disclosed to Defendants and that it was located in the Project File. How difficult, then, would it have been for Berry to cite to some of it? How difficult to identify it in answers to interrogatories? How difficult for expert Halligan to have pointed to it when asked? It's not in Berry's affidavit and it's not in Halligan's deposition; it's not anywhere. There was no way for the Lawyer Appellees to defend themselves by negating the trade secret characterization of the claimed disclosures.

Which is why a non-movant cannot resist summary judgment with generalized, conclusory statements of the sort that Berry offered in his declaration.

> Defects in the substance of an affidavit are not waived by the failure to obtain a ruling from the trial court on the objection, and they may be raised for the first time on appeal. *Brown v. Brown*, 145 S.W.3d 745, 751 (Tex. App.-Dallas 2004, pet. denied). An affidavit that is conclusory is substantively defective, and the failure to object or obtain a ruling on an objection does not waive the substantive defect. *Id*. Conclusory affidavits do not raise fact issues. *Ryland Group, Inc. v. Hood*, 924 S.W.2d 120, 122 (Tex. 1996); *Trejo v. Laredo Nat'l Bank*, 185 S.W.3d 43, 50 (Tex. App.-San Antonio 2005, no pet.). <u>A conclusory statement is one that does not provide the underlying facts to support the conclusion</u>. *Trejo*, 185 S.W.3d at 50; *Brown*, 145 S.W.3d at 751. [*Paragon General Contractors, Inc. v. Larco Constr., Inc.*, 227 S.W.3d 876, 883-884 (Tex.App. -- Dallas 2007, no pet.) (summary judgment *affirmed*).]

This is as true in trade secret cases as it is generally. (*Game Sys. v. Forbes Hutton Leasing, Inc.*, 2011 Tex. App. LEXIS 4098, **75-76 (Tex.App.- Fort Worth 2011, no pet.) (affirming summary judgment against trade secret misappropriation claim;

"[t]he assertions in Weaver's affidavit that Tronics took Game Systems's source code are conclusory. Weaver does not offer any facts showing a basis for knowledge that Tronics took Game Systems's source code. He does not state why he believes that Tronics took Game Systems's property; he does not describe what source code he refers to or how it came into Tronics's possession" [footnote omitted]); *Alliantgroup, L.P. v. Solanji*, 2014 Tex.App. LEXIS 2961 (Tex.App. - Houston [1st Dist.] 2014, no pet.) (summary judgment *affirmed* in trade secret breach of contract case); *General Insulation Co. v. King*, 2010 Tex. App. LEXIS 490 (Tex. App. - Houston [14th Dist.] 2010, no pet.) (summary judgment *affirmed*; evidence showed that while information may have been "confidential," it was not a trade secret); *Parker Barber & Beauty Supply, Inc. v. Wella Corp.*, 2006 Tex.App. LEXIS 8841 (Tex. App. - Austin 2006, no pet.) (summary judgment *affirmed*; same); *Security Telecom Corp. v. Meziere*, 2000 Tex. App. LEXIS 1818 (Tex.App. – Dallas, no pet.) (summary judgment *affirmed*; no showing of trade secret).)

The point bears repeating, because the fundamental fallacy of Lake Travis's position appears throughout its evidence – especially the Berry Declaration and expert Halligan's testimony – and Brief: Its insistence that every fact, every observation, every opinion about the Lake Travis project, no matter how un-secret, obvious, or speculative, was a trade secret – that the project as whole, itself, was a trade secret. Never mind the empty shell of a building out off Farm-to-Market 620

behind the post office; never mind the newspaper articles; never mind Health Care REIT providing detailed information to the Lawyer Appellees before they knew anything about Lake Travis; never mind the visibility of the parking lot; never mind the information openly provided to and on file with the City of Lakeway; never mind Lakeway's own considerable knowledge of the medical services market and what it takes to run an acute care facility; never mind the obviousness of the proposition that an empty building and a nonoperating enterprise probably has neither an operator nor a staff – if an observation or opinion had anything to do at all with Lake Travis project, a cone of silence was expected to descend over the communicator.

## B. Second Element: There Was No Evidence Attorney Appellees Received "Trade Secrets" from Lake Travis, or Through Breach of a Relationship or Otherwise Improper Means; the Lake Travis Brief's Record Citation Is to Its Own Summary Judgment Brief in the Trial Court Which Itself Does Not Cite to the Record.

The first element – the existence of any trade secrets at all – is closely tied to all the rest:  Lawyer Appellees' receipt from Lake Travis (or wrongful receipt from another), and their disclosure and use by the Lawyer Appellees.  If there are no qualified Lake Travis trade secrets, it follows that there was no misappropriation, disclosure, use, or injury.

But putting aside the failure to identify trade secrets, much less qualify them as such under Texas law, consider:   Berry's affidavit says time after time

after time that Lake Travis communicated trade secrets to the "Defendants," mentioning the usual broad categories of documents. There is no evidence, however, that any of it was communicated to the Lawyer Appellees. That Project File has over four reams of paper in it, scannable, copyable hard copy, but Lake Travis has not produced one email attaching documents, not one transmittal letter, not one hand-delivery receipt or air express bill, suggesting that any of it was provided to the Lawyer Appellees.

Faced with this hole in its evidence, Lake Travis has resorted to an extraordinary tactic in this appeal. The centerpiece of its claim of misappropriation is a lengthy quote (at 14-15) reciting Bates numbers for documents Lake Travis claims to have provided to "Defendants." <u>But that long excerpt is not from any sworn evidence – it is a quotation from Lake Travis's response to the Hospital Appellants' summary judgment motion</u>. Turning to those pages from the Lake Travis brief below in the appellate record (CR3 11919-11920), we see that that excerpt contains no citation to the record. It is completely incompetent summary judgment evidence and – again respectfully begging the Court's pardon for any offense to comity – it is grossly improper for Lake Travis to have cited it as though it were record evidence of a genuine issue of material fact supporting reversal. Like most of Lake Travis's "evidence," it's lengthy and detailed, but ultimately empty of evidence to create a genuine issue of fact.

In fact, the only piece of specific information shown to have been provided to Defendants is attached as Exhibit 1-C to Berry's Declaration (omitted from Appendix 7 to the Lake Travis Brief). It's "inspection comments" (not attached to the exhibit, by the way, so we don't know what they are) sent by an Interra development entity to a number of individuals – but not to the Lawyer Appellees.[8] (CR2 7631.) Basically, nothing.

This leaves only Robert Berry's *ispe dixit* claims. Like all the other elements of the tort, a fact issue on misappropriation may not be based on conclusory affidavits.

> Rimkus' relied exclusively on the affidavit of Ralph S. Graham, its senior vice-president, to substantiate its claim that Dupre misappropriated its trade secrets. The affidavit, however, fails to indicate which trade secrets Dupre allegedly misappropriated. * * * Affidavits which contain conclusory statements that <u>fail to provide the underlying facts</u> to support the conclusion are not proper summary judgment evidence. [*Rimkus Consulting Group, Inc. v. Dupre*, 2001 Tex.App. LEXIS 6170, **10-11 (Tex.App. - Houston [14th Dist.] 2001, no pet.) (citation omitted; emphases supplied).]

Lake Travis's improper self-vouching by citing the text of its own unsupported brief below eloquently eliminates this element of its misappropriation cause of action.

---

[8] The Lake Travis Brief (at 17) also cites an email from Sossi to Health Care REIT dated January 14, 2011. (CR2 8015-16.) But that letter shows Sossi warning Health Care REIT about <u>Lake Travis's</u> possible violation of the LOI, and does nothing but describe the LOI provisions at issue. It is not evidence of the Lawyer Appellees' receipt or use of identified Texas-qualified trade secrets.

**C.** **Third Element: There Was No Evidence that the Lawyer Appellees "Disclosed" or "Used" any "Trade Secret."**

As noted, Lake Travis's interrogatory answers, the only sworn source of information on what Lake Travis planned to claim as trade secrets (until expert Halligan's spectacular collapse), identified only broad categories of information, but no particular trade secret claimed to have been disclosed or used. So Defendants were eager to test Lake Travis CEO Robert Berry on these categories in deposition to nail down the identity of the documents or other information involved – information critical to a defense of Lake Travis's claims.

The result was unexpected and stunning. As chronicled in detail in Subsection I(B) of the Statement of Facts, *Berry refused to answer any questions respecting disclosure of any trade secret information belonging to any of the categories identified in his sworn interrogatory answers*. Berry was Lake Travis's CEO, Managing Member, and co-principal, but he claimed the <u>only</u> information he had on misappropriation and the identity of trade secrets was known to him through his lawyer and therefore privileged. In answer to Lawyer Appellees' counsel's direct questions on misappropriation and disclosure, Berry refused to identify any instances with respect to Lake Travis's

- trade secrets generally (twice);

- architectural plans;

- program design;

---

- financial information;

- hospital organization;

- mission;

- staff recruitment and retention;

- sources and uses of funds and other cost-based information;

- preliminary financial feasibility;

- projected revenues and costs;

- and preliminary financial feasibility ratios and other information about projected key operational ratios. (CR2 5375, 5377-80.)

Berry was no more forthcoming when asked about the identity of any trade secrets Lake Travis claimed HUD relied on with respect to the loan guaranty. He <u>twice refused to answer "what specific trade secret of [Lake Travis]" was disclosed to HUD and relied on by it to issue the loan guaranty</u>. (CR2 5381-82.)

Not only do these answers – rather, non-answers – sink Lake Travis's misappropriation claim, they are especially meaningful when considered in light of Lake Travis's claims about Sossi's May 10 Email to HUD, discussed in detail in the Statement of Facts, Section II(G). The May 10 Email was certainly well-known to Berry and not in any way privileged, but he did not identify it as a disclosure or use of Lake Travis's trade secrets. Indeed, he testified that the following assertions or opinions in the May 10 Email were either not communicated to Defendants, or

were false, or both:

- That Lake Travis missed a deadline.

- That Lake Travis hospital had code violations.

- That conversion of Lake Travis Hospital to a general acute-care hospital would be costly.

- That it would be difficult to expand Lake Travis Hospital in the future.

- That Lake Travis had no physician support or a list of interested physicians.

- That Lake Travis Hospital would not open in summer 2010.

- That Lake Travis Hospital did not have an operator.

- That Lake Travis Hospital did not have an operational staff.

- That the City of Lakeway would have approve the conversion of Lake Travis Hospital from a long-term to general acute care facility.

Thus, in answering as he did Berry himself plainly did not regard the May 10 Email as a damaging disclosure of trade secrets, or, indeed, as a disclosure of trade secrets at all.

The only other communication of any substance cited by Lake Travis is Sossi's June 21, 2010, letter to two government attorneys, described in detail in the Statement of Facts, Subsection II(G), which we incorporate here. That description

demonstrates that far from evidence of trade secret misappropriation, it shows Lake Travis's own lawyer communicating with HUD on project matters, and support's Sossi's testimony on the non-secret provenance of the information he was communicating. In citing this letter, Lake Travis is required to take the impossible position that its lawyer can communicate with HUD – which, from the context, dealt with Lake Travis's plans, its progress, conversion, and the like, which it now claims to be "secret" – but that the same subject matter in Sossi's hands was a trade secret that he could not use to correct (by his lights) Lake Travis's counsel's misstatements. Sossi's communication here was backed up by the very public Mayor of Lakeway relying on very public records and the very public appearance of the shell of what Lake Travis hoped someday would be the Lake Travis Hospital.

The Lawyer Appellees have no quarrel with the general principles set forth in Lake Travis's cases reciting that "[t]rade secret information disclosed pursuant to negotiations for the sale of a business are disclosed under a duty of confidence." (*H.E. Butt Grocery Co. v. Moody's Quality Meats, Inc.*, 951 S.W.2d 33, 36 (Tex. App.–Corpus Christi 1997, pet. denied), cited at Lake Travis Brief at 18-19.) But they apply only if there's a trade secret at issue, which, in this case, Lake Travis has not only failed, but refused, to establish. In *H.E.Butt*, for example, the appellate court threw out the trial court verdict for the trade secret plaintiff for failure to

establish trade secret status of the information conveyed during the business negotiation. In *Daniels Health Sciences, LLC v. Vascular Health Sciences, LLC*, 710 F.3d 579, 584 (5th Cir. 2013), also cited, there was an identifiable trade secret – the formula for a vascular health supplement. In *Hyde Corp. v. Huffines*, 314 S.W.2d 763 (Tex. 1958), also cited, the trade secret was an intricate patent-pending design for a "compressor mechanism for refuse truck." Contrast these cases with Lake Travis's, where its chief witness refused to answer the fundamental questions about disclosure and use.

There was no admissible evidence of improper disclosure or use of any Lake Travis trade secret. The third element of the tort fails.

**D.      Fourth Element:  There Was No Evidence that Lake Travis's Failure Had Any Connection with Any Activity by Lawyer Appellees.**

The final element of a misappropriation claim is that the plaintiff must have suffered damages as a result of the claimed misappropriation. There is no misappropriation injury "in the air"; in trade secret cases, as in any other, "in order to recover any type of damages, a plaintiff must produce evidence from which the jury may reasonably infer that the damages sued for have resulted from the conduct of the defendant." (*Rusty's Weigh Scales & Serv., Inc. v. N. Tex. Scales, Inc.*, 314 S.W.3d 105, 111 (Tex. App. - El Paso 2010, no pet.) (affirming judgment for trade secret defendant for plaintiff's failure to satisfy fourth element of damage caused

by misappropriation).) While misappropriation injury need not be precisely quantified, as to causation it cannot be speculative where numerous other competitive risks are present:

> Profits which are largely speculative, as from an activity dependent on <u>uncertain or changing market conditions</u>, or on <u>chancy business opportunities</u>, or on promotion of untested products or <u>entry into unknown or unviable markets</u>, or on the success of <u>a new and unproven enterprise</u>, cannot be recovered. Factors like these and others which make a business venture risky in prospect preclude recovery of lost profits in retrospect. [*Lamont v. Vaquillas Energy Lopeno, Ltd.*, 421 S.W.3d 198, 225 (Tex. App. - San Antonio 2013, pet. denied) (citation omitted; emphasis supplied) (trade secret case; trial evidence held sufficient).]

There is no doubt that Lake Travis Hospital failed – indeed, never even got underway -- but there is similarly no doubt that Lake Travis failed to adduce a scintilla of evidence that its woes resulted from any misappropriation of Lake Travis's trade secrets.

Instead, the undisputed evidence is that the Lake Travis project was extremely uncertain of viability before the Brennan Firm or Frank Sossi ever heard of it. Its sole financier Health Care REIT was gravely concerned about the effect of the Medicaid and SCHIP Extension Act of 2007 on Lake Travis's ability to succeed, and the evidence is undisputed that it – not Lake Travis – reached out to Surgical Development and Lakeway for a potential lifeline that Lake Travis's principals Berry and McDonald eagerly grasped. That Lakeway eventually took a pass as did every other investor (other than Health Care REIT) who looked at the

project cannot be laid at Lawyer Appellees' door.

Unlike almost every other trade secret case in the Texas reporters, this was not a case where Lake Travis was charging the Lawyer Appellees with using the claimed "trade secrets" in their own business or to aid the business operation of the Lakeway Hospital, or with wrongfully disclosing them to the public. Rather, the summary judgment evidence related exclusively to the Lawyer Appellees' communications with HUD, who was not in competition with Lake Travis.

But Lakeway's pursuit of a HUD loan guaranty had nothing to do with Lake Travis or any "trade secrets." As noted, the evidence was undisputed that Lakeway was under development prior to and independently of any contact at all between Lake Travis or its worried landlord Health Care REIT. Lakeway and Surgical Development, aided by their attorneys Lawyer Appellees, never stopped their efforts to develop Lakeway nor were they required to do so because Surgical Development entered into the LOI. The evidence is undisputed that:

> (1)    HUD's Robert Deen testified that HUD received no information from Lawyer Appellees on Lake Travis or Lake Travis Hospital prior to the issuance of its commitment to guaranty Lakeway's loan.

> (2)    He also testified that he did not discuss Lake Travis or Lake Travis hospital with Sossi in any telephone conversation.

> (3)    He learned of the Lake Travis development through a Lake

Travis View newspaper article from February 2009 in which Berry himself was the source for the information that the facility was intended for long-term acute care patients.

We have discussed Sossi's post-loan-commitment contacts with HUD in defense of the loan commitment in detail above and will not repeat that discussion here. For purposes of this element of Lake Travis's claim however, we note that these communications were prompted by a complaint by a third-party health-care competitor (Westway Hospital) who provided (obviously non-trade-secret) information to HUD calling into question whether the geographic area in question was underserved for general acute care. The information that Lake Travis was still holding itself out as a planned long-term acute care facility and that it had no visible prospects of opening soon was not in any way secret, as demonstrated by the communication from Lakeway's Mayor DeOme attached to Sossi's May 10 Email. Despite extensive discovery from HUD in this case, Lake Travis offers no evidence that if Sossi had never had a single contact with HUD (1) HUD would have withdrawn its guaranty of Lakeway's loan or (2) that if it had, Lake Travis would have had any greater success in attracting investors or (3) opening and operating profitably.

As with the foregoing elements, a fact issue on causation cannot be generated simply by asserting its existence. In a case similar to this one, plaintiff

in *Am. Steel & Supply, Inc. v. Commercial Metals, Inc.*, 2010 Tex.App. LEXIS 1776, \*5, \*\*17-18 (Tex.App. - Corpus Christi 2010, pet. denied) alleged that the defendant had expressed an interest in purchasing plaintiff's business and in the course of due diligence had received plaintiff's trade secrets, which it used to plaintiff's competitive harm.

> Ward's original affidavit provided no factual context for any of its conclusions. With respect to causation, the affidavit merely states "[a]fter the events at issue," certain events occurred, including that American Steel lost business and American Steel's customers purchased structural steel from Commercial Metals. Nowhere, however, does the affidavit explain what those events were, or how they caused American Steel to lose business. We hold that these statements do not constitute more than a scintilla of evidence to support causation, and the trial court did not err in granting the motion for summary judgment.

*See also Speedemissions, Inc. v. Capital C Enters.*, 2008 Tex.App. LEXIS 7303, \*\*17-19 (Tex.App. - Houston [1st Dist.] 2008, no pet.) (trade secret case; summary judgment affirmed where plaintiff presented only "bare legal conclusions" as to damage and injury); *Plotkin v. Joekel*, 304 S.W.3d 455, 487 (Tex.App. - Houston [1st Dist.] 2009, no pet.) ("[c]onclusory affidavits are not enough to raise fact issues" in that "[t]hey are not credible, nor [are they] susceptible to being readily controverted") (summary judgment on tortious interference claim *affirmed*); *Cuidado Casero Home Health of El Paso, Inc. v. Ayuda Home Health Care Servs.*, LLC, 404 S.W.3d 737 (Tex. App. - El Paso 2013, no pet.) (same; trade secret summary judgment *affirmed*).)

If there is no evidence of injury resulting from wrongdoing, it follows that there is no evidence of damages caused thereby. Nevertheless, we briefly consider Lake Travis's arguments on damages. (Lake Travis's Brief at 27-30.) It claims a sufficient summary judgment showing with respect to either loss of market value, benefits obtained by Lakeway, or "reasonable royalty."

Lake Travis's "reasonable royalty" cases show the absurdity of its claim here. First up is *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518 (5th Cir. 1974). This decision applies Georgia, not Texas, law. Putting that aside, the stolen trade secret there was an actual thing, a "retail inventory control system" called AIMES III, for Automated Inventory Management Evaluation System. (*Id*. at 709.) In *Southwestern Energy Prod. Co. v. Berry-Helfand*, 411 S.W.3d 581, 587 (Tex. App. Tyler 2013), the trade secret was once again something someone would pay a royalty for, an exhaustive, unique, highly technical and unquestionably identifiable analysis of oil prospects in the James Lime formation. Lake Travis's final "royalty" case is *Bohnsack v. Varco, L.P.*, 668 F.3d 262, 267 (5th Cir. Tex. 2012), where an actual invention was stolen, the "Pit Bull," "a portable pumping machine that reduces the volume of cuttings that remain in [oil] tanks after the mud passes through" and separates the mud from the drilling fluids, that saves days in the drilling process.

Contrast these cases where there was a true theft and commercial use of

unique, highly proprietary, and valuable information or designs – tangible items with obvious royaltyable value -- with what Lake Travis is claiming. The only claimed disclosure (disputed by Lawyer Appellees, but let's just say) was the May 10 Email, which "discloses" or "uses," if that is the word for it, that Lake Travis missed a deadline, had code violations and insufficient parking, would be costly and difficult to expand, lacked physician support, an operator, and a staff, and wouldn't be open in summer 2010. This is simply not royaltyable information – there is no "willing buyer/willing seller" hypothetical to pursue here. Another way of saying this is that you at least have to have an identified, Texas-qualified trade secret – information, invention, something – to which a royalty might be attached, and Lake Travis does not. It only values the "Project File," which isn't even real. Berry's hugely overstated damage calculation is a direct result of Lake Travis's theory that its entire enterprise is a trade secret, so its market value/purchase price must be the value of the whole company.

But Lake Travis's royalty discussion has a more serious problem. It contains only a single cite to the record, Paragraph 15 of the Berry Declaration. (CR2 7611-12.) Paragraph 15 of the Berry Declaration says nothing about a reasonable royalty for what Berry is claiming to be a trade secret. In fact, the Berry Declaration does not contain the word "royalty." Lake Travis's assertion of royalty damages isn't within shouting distance of a scintilla.

We need then not pause long to consider Lake Travis's position, appended to its "damages" discussion at 31 (Subsection (d)), that a "royalty damages" theory reads out of the elements of the tort that the damages had to result from the tort – couched, in this case, as an assertion that if it asserts a "royalty" theory it need not show that the Lawyer Appellees' communications about Lake Travis made HUD do what it did (which is only part of Lake Travis's causation burden in this matter in any case). There is no support for this odd assertion in the cases (the sole citation is to *Southwestern Energy Prod. Co.*, 411 S.W.3d at 609, which does not so hold). "Reasonable royalty" is only one of the possible formulations for trade secret damages and while it is true that it does not require proof of lost profits, simply asserting it as a damage theory does not alter the traditional elements of the tort.

That leaves loss of market value and benefit to the defendant. As above, the failure of the other elements of Lake Travis's misappropriation claim – and the causation element of this fourth element – tie directly to the sub-scintilla status of Berry's claims here as well. It simply makes no sense to calculate Lake Travis's loss or Lakeway's gain as Berry has done in his affidavit. There is no evidence that the single email from Sossi to HUD regarding confirmation of a loan guaranty that had already been made (and made before the Lawyer Appellees ever had <u>any</u> communications with HUD mentioning Lake Travis) and the few other (and almost

undocumented) communications caused the failure of a project that was already entirely moribund and vaulted Lakeway to success it would not otherwise have enjoyed.

There are a lot of detailed assertions in the Berry Declaration, but they are all ultimately conclusory (including reference to a damage expert to which Lake Travis does not cite); like a schoolboy's math exam, he is required to show his work. "When the failure to attach sworn or certified copies of papers referenced in the affidavit leaves it conclusory, the affidavit does not raise a fact issue. Tex. R. Civ. P. 166a(f)[.] A conclusory statement is one that does not provide the underlying facts to support the conclusion." (*Lina T. Ramey & Assocs. v. TBE Group, Inc*., 2015 Tex.App. LEXIS 5089 (Tex.App. - Dallas 2015) (summary judgment *affirmed*); *see also Plas-Tex, Inc. v. Jones*, 2000 Tex. App. LEXIS 3188, *18 (Tex.App. - Austin  2000, pet denied) ("Hufford's affidavit contains only conclusory statements regarding the value of intangible assets such as unidentified trade secrets, tax loss carry forwards, Air Board permits, and goodwill; he provides no facts to support his evaluations"; summary judgment on breach of fiduciary duty count *affirmed*).)  And again – when the trade secret has been misidentified as the whole company, valuing that misidentified trade secret will not result in a credible damage calculation.

In the end, Berry's numbers don't matter; Lake Travis offered no evidence

that the few and brief communications of which it complains caused it any injury at all. The fourth element lacked a scintilla of summary judgment support.

## CONCLUSION

Lake Travis's cause of action for trade secret misappropriation against the Lawyer Appellees failed in a spectacular way. Its theory that "everything's a trade secret" was moribund in the trial court is no more viable here. It embarrassed both CEO Berry and "expert" Halligan at their depositions. It was the only theory available in the absence of specific evidence for any of the elements. The trial court recognized its nonconformity with Texas law and correctly dismissed it.

The trial court's order granting the Lawyer Appellees' motion for summary judgment on Lake Travis's claim against them for trade secret misappropriation should be affirmed.

## PRAYER

For the reasons set forth above, the Lawyer Appellees respectfully request that this Court issue an order affirming the July 16, 2014, Order of the trial court dismissing Lake Travis's claims against them with prejudice (7/17 SR 201-02) and granting them such other relief to which they may be entitled.

Respectfully submitted,

**GORDON & REES LLP**

By: */s/ B. Ryan Fellman*
      **Robert A. Bragalone**
      BBragalone@GordonRees.com
      Texas Bar No.: 02855850
      **B. Ryan Fellman**
      RFellman@GordonRees.com
      Texas Bar No.: 24072544

      **GORDON & REES LLP**
      Suite 2800
      2100 Ross Avenue
      Dallas, Texas 75201
      Phone: 214-231-4660
      Fax: 214-461-4053

## CERTIFICATE OF COMPLIANCE

The Lawyer Appellees hereby certify that the foregoing brief complies with the word limitations of Rule 9.4(i)(2)(B), Tex.R.App.P. The program used to create this brief reports that the applicable sections contain 14,715 words.


_/s/ B. Ryan Fellman_
B. Ryan Fellman

# CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of November, 2015, the foregoing motion was served by electronic service and/or email upon the following counsel of record:

S. Abraham Kuczaj III, Esq.
*akuczaj@scottdoug.com*
Paige A. Amstutz, Esq.
*pamstutz@scottdoug.com*
Steven J. Wingard, Esq.
*swingard@scottdoug.com*
Jane Webre, Esq.
*jwebre@scottdoug.com*
SCOTT, DOUGLASS &MCCONNICO, LLP
303 Colorado, Suite 2400
Austin, TX 78701

***Counsel for Appellee/Cross-Appellant Lake Travis Transitional LTCH, LLC***

Jeff Cody, Esq.
*jeff.cody@nortonrosefulbright.com*
Barton Wayne Cox, Esq.
*beau.cox@nortonrosefulbright.com*
James V. Leito IV, Esq.
*james.leito@nortonrosefulbright.com*
NORTON ROSE FULBRIGHT US LLP
2200 Ross Avenue, Suite 3600
Dallas, TX 75201-2784

Joy M. Soloway, Esq.
*joy.soloway@nortonrosefulbright.com*
NORTON ROSE FULBRIGHT US LLP
1301 McKinney, Suite 5100
Houston, TX 77010-3095

***Counsel for Appellants/Cross-Appellees Lakeway Regional Medical Center, LLC and Surgical Development Partners, LLC***

Jessica Z. Barger, Esq.
*barger@wrightclose.com*
Raffi Melkonian, Esq.
*melkonian@wrightclose.com*
WRIGHT & CLOSE, LLP
One Riverway, Suite 2200
Houston, TX 77056

***Counsel for Appellant/Cross-Appellee Surgical Development Partners, LLC***

By: */s/ B. Ryan Fellman*